Jones C. J.
S. Woods of Boston, the owner of the Holly, chartered her to the plaintiff-for a voyage from Boston to South America and back to Boston, at a stipulated compensation or hire per month. The charter-party was an absolute demise of the ship to the plaintiff for the voyage, and transferred the whole ownership of her pro hac vice to the charterer. The brig made her outward voyage and was despatched on a return voyage for New-York or Boston, but took on board a shipment of a stranger on freight consigned to a house in New-York, to which port she proceeded. Lander the charterer, failed in business, and became insolvent before the arrival of the brig at New-York; and on her arrival at that place, Woods the owner, entered upon her and insisted on holding the goods he found on board for the payment of his charter-money; or at least upon his right to the freight of those goods brought in her for the New-York house on freight. This freight was received by the defendant, who was master of the brig and who *359 thereupon delivered the goods; and this suit is brought for the recovery of the money so received.
On these facts two questions are made,—first whether the owner had a ken on the cargo of the chartered vessel, for his charter-money; and 2d, whether the deviation and departure of the ship from the voyage described in the charter-party, dissolved the contract and remitted the' owner to his original rights.
The case is submitted by the parties on written arguments, the one side relying chiefly upon an opinion of a distinguished jurist* of our own state and the other upon a judicial decision of the Supreme Court of a sister state. On the first point they concur in opinion; and it is perfectly clear from the terms of the charter-party, that the owner could have no lien on the goods shipped by the charterer, or under his authority on board the Holly for his freight. The entire vessel was let to hire by the owner to the charterer for the voyage, at a monthly rate of compensation and the distinction which runs through all the cases is, that where the possession and control of the ship are retained by the owner, and lie covenants to carry the goods of the charterer in her for a stipulated freight, the lien for the freight remains. But where he transfers the ship to the charterer for the voyage, and the whole charge and control of her devolve upon the charterer, the owner can have no lien upon the cargo for the freight, but must have recourse to his covenant for hi#remedy in case of default of payment. Possession is essential to the existence of a lien. Here the plaintiff parted with his possession of the vessel, and he consequently, had no lien upon the cargo for his freight, but relied upon his covenant for his security.
The only material question is, whether the deviation or change of voyage dissolved the charter-party, or gave a right to the owner to re-possess himself of his vessel, and whether in either case he was remitted to his right as owner, and became entitled as such to retain the cargo as for freight. On this point the opinions laid before us disagree.
*360 On the part of the plaintiff, it is contended, that the voyage for which the vessel was let to charter, has been changed, and that the owner is thereby discharged from the obligation of the contract; and it is said, that as the freight was payable on the return of the vessel from the voyage, and could by the change of voyage never become due, the owner shall be remitted to his original remedy by lien on the goods for the price of the carriage. The cases cited in support of the proposition do not sustain it.
The case of Cook v. Jennings, [7th D. & E. 381.] was an action on a charter-party for freight covenanted to be paid on the arrival of the vessel at Liverpool, partly in money and the residue by a bill at four months. The ship was prevented from performing the voyage by perils at sea, and the cargo landed at a port of necessity, and accepted by the freighter. Held, that no action would lie on the charter-party, because the delivery of the goods at the port of discharge was a condition precedent which had not been complied with. But in that case, delivery was prevented by causes to which the charterer was not accessary, and not by the act of the charterer. In the same case, Lord Kenyon, C. J., puts the case of a covenant by A to enfeoff B, (a stranger to the deed,) and states the law to be, as it clearly is, that A is not absolved from his covenant, though B will not accept livery of seisin, unless the act be frustrated by the act of the covenantee, thus taking the true distinction, that where the compliance with the condition precedent is prevented iy the party himself who seeks to take advantage of the non-peformance, it shall not avail him ; and upon that distinction this case differs from those cited.
In the case of Philips & Butler v. Rose, [8 J. R. 392.] the action was covenant on articles of agreement, by which the plaintiffs agreed to erect a frame of certain dimensions on a certain lot, for an oil mill, on or before the 15th of June following; and the defendant agreed to make the press and other machinery, and to complete the same, the plaintiffs finding the materials, and boarding the workmen, and when completed, the plaintiffs were to procure and lay in 4000 bushels of flax-seed, which the defendant was to make into oil, &c.
*361 The declaration recited the agreement, and averred performanee, Sic. on the part of the plaintiffs as to erecting the frame of the mill by the 15th of June, and alleged a breach on the part of the defendant. The evidence was, that the frame of the mill had been erected, but not until the 15th of September following the 11thof June; and that the defendant declared afterwards, that it was immaterial whether the frame was erected by the 15th of June or not; and that its not being finished by that time, was no damage to him, as he had not procured the workmen or the money. The evidence was objected to, but admitted. The mill was not erected on the spot, nor of the exact dimensions specified in the agreement, and parol evidence was also admitted, to show that the defendant had consented to the alterations, and assisted in fixing the spot, and directing the workmen in erecting the building, which was objected to as not supporting the declaration, but admitted. The defendant had performed no part of his agreement. A verdict was taken for the plaintiff, subject to the opinion of the court on a case. ■
The court held, that the contract must be proved as it is laid, otherwise the defendant has no notice of what he is called upon to answer, and that evidence that the contract was enlarged by parol agreement, will not support the declaration.
In Keating v. Price [1 J. C. 22.] a special written agreement, whereby the defendant was to deliver to the plaintiff a quantity of staves, at a stipulated price, by a given day, viz : the 1st of May 1796. The defendant proved that the plaintiff in January 1797, admitted that he had agreed to extend the time for the delivery of the staves until the spring of 1797. A verdictwastaken for the plaintiff subject to the opinion of the court, on the question whether the time for performing the contract could be extended by a subsequent agreement between the parties, and whether testimony could be received to prove the admission of the plaintiff of such enlargement of the time. The court declared themselves of opinion that being originally a simple contract, it was competent for the parties by parol agreement to enlarge the time of performing it, and that parol testimony to prove the plaintiff’s declaration to that effect was admissible, an extension of the time *362 being often essential to the performance of executory contracts, and there can be no reason why a subsequent agreement for that purpose should not be valid.
The question, however, did not arise here upon the form of the plaintiff’s pleadings, nor upon the competency of the evidence to support the declaration. The plaintiff proved his case by showing the agreement, and the failure of performance by the stipulated day, and the defendant was put to his excuse of the non-performance for Ms defence; and to sustain that defence, he introduced the testimony to show the agreement to enlarge the time for performance, and the question for the court was the validity of such an agreement, and what its operation was upon the previous written agreement. If the party to the contract, who obtained the extension of time to perform, had brought his suit upon the original agreement, having averred performance by the day, and had on the trial shown a performance after the day, and an agreement of the other party to extend the time, the question would have arisen whether his proof supported his pleading, and then the principle afterwards settled in Philips & Butler v. Rose, would have applied.
In Littler v. Holland, [3 Term R. 590.] the action was covenant on articles of agreement to build two houses on or before 1st April 1788; on the erection of which the defendant was to pay ¿£500. The declaration stated that the houses were built and finished by the time, according to the agreement, but that the defendant had not paid. The defendant pleaded that the houses were not finished at the time limited by the contract; on which issue was taken. On the trial it appeared, that the work was not completed by the 1st April, but that the parties had by a parol agreement, subsequent to the date of the articles, enlarged the time, and that the whole work was completed before the expiration of that enlarged time.
It was contended that this was a substantial compliance with the contract, and a case was cited in which Justice Buller was said to have ruled, that, where there had been an agreement to deliver a quantity of barley by a given day, and it was afterwards agreed, that the defendant should have a month longer to perform *363 the contract; the subsequent agreement was only a continuation of the first contract, a forbearance by the plaintiff for a longer time, and that a performance within the month would have been a substantial performance within the meaning of the first contract; and it was insisted that though that was assumpsit and this covenant, the principle was the same and ought to govern the case. It was admitted, that the subsequent agreement by parol, could not vary the terms of the contract; but it was contended, that it might be offered as evidence, that after the defendant’s consent to enlarge the time, he was estopped from saying that it was not a substantial performance within the terms of the original contract. But Kenyon Chief Justice said the point was so clear, he was not inclined to grant a rule to show cause. The declaration charged that the parties had stipulated by deed to perform a specific thing by a certain day; then if the plaintiff who sues on the contract, be not bound to prove it as laid, the defendant has no notice of that, which he is called upon to answer.
In Roe dem. Gregson v. Harrison,[2d T. R. 425.] a lease contained a proviso that the lessee should not let without leave in writing, on pain of forfeiture; and a parol license to let was held not to discharge the lessee from the restriction of such a proviso. And in Brown v. Goodman, [cited in a note to 3d T. R. 593.] which was debt on an arbitration bond, in which the time was limited for the arbitrator to make his award, the declaration stated, that the time was, by mutual consent of parties, enlarged; and that the arbitrator made his award within the enlarged time; but Lord Kenyon held, that the defendant had bound himself, to abide by an award under a penalty, if made within a given time r but that could never extend the penalty to an award, made after that time under a new agreement.
The principle of this last case was recognized and confirmed by the Supreme Court in the case of Freeman v. Adams,[ 9th John. R. 115.] It was there held, that an action would notinsuch case lie on the bond, but that the remedy of the party is upon the submission implied in the agreement to enlarge the time. And the court advert to the case of Philips v. Rose, [8th John. R. 392.] as *364 an authority to show, that if a contract be subsequently changed, you must declare otherwise than on the contract itself. And they observe, that there is a wide difference between the case of a suit to enforce the bond or contract, in consequence of such agreement, and a plea of a discharge by the obligee, from a strict and literal compliance with the obligation, according to the doctrine in Fleming v. Gilbert. [3 John. R. 528.]
The same rule applies to charter-parties, and the strict compliance with a condition precedent, has, upon the same principle, been dispensed with where the party who objects to the action for want of such compliance, was himself the immediate cause of it. And in the case of Hotham v. The East India Company, [1 T. R. 638.] sanctioned by the court in Smith v. Wilson, the only thing that stood in the way of the plaintiff’s recovering the allowance claimed for short tonnage, according to the terms of the charter-party, after having taken all proper steps on his part to obtain the necessary certificate to entitle him thereto, was the neglect and default of the company’s own agent in refusing to afford him such certificate.
In that case, the court ruled, that assuming the clause relating to the certificate to be a condition precedent, yet the plaintiff’s having taken all proper steps to obtain the certificate, and it being rendered impossible to be performed by the neglect and default of the company’s agents, it was equal to performance. And the court emphatically add, that if it were necessary to cite any case for this, which is evident from common sense, it was so held in Roll’s Abridgement, 445., and many other books.
In the case at bar, the charter was for a voyage from Boston to the east coast of South America, and back to Boston, where the vessel was to be discharged. And the covenant of the charterer is to pay for the use of her at the rate of $600 per month, in thirty days after her return to Boston. She arrived at Rio Grande, a port in the east coast of South America, and was sent from .thence by the agents of the charterer with a cargo to the port of New-York, with direction to the master, after disi barging the cargo taken on freíghfffor that port, to wait the orders of Lander, ’-he charterer, as to the uitenor destination of the brig. Thus *365 the return of the vessel direct to Boston, which the terms of the charter-party are supposed to require, was rendered impracticable by the act of the charterer, whose agent sent her to the port of New-York. He therefore could not make it an objection to an action in this court for freight, that the return of the vessel to Boston was a condition precedent, which had not been performed. For it was an act which was to be done by himself, and his own breach of his implied covenant to return with the vessel direct to Boston, could not be 'set up or insisted upon by him as a defence against the action for the freight. If, then, it be admitted, that the neglect and default of the charterer in not returning with the vessel direct to Boston, was equivalent to performance, within the meaning and spirit of the cases, still the consequence could only be that, eo instanti, Iris wilful departure and deviation from the track of the voyage for which the brig was chartered to him, was consummate^ by conducting her to the port of New-York instead of Boston, he became liable to an action on his covenant for the monthly hire of the vessel, and the remedy of the owner against him was as complete as it would have been in case of her return to Boston.
The rule applied in cases of the capture of neutral vessels, rests on the same principle: for although the voyage is not completed, and consequently the whole freight not earned, yet as the captor has prevented its completion, his seizure shall operate to the same effect as an actual delivery of the goods to the consignee, and subject him to the payment of full freight. [The Copenhagen, 1 Robinson’s Admiralty, R. p. 289.] If, then, the charterer breaks up the voyage, or substitutes a different port of destination from that authorized by the charter-party, whereby he prevents the completion of the voyage, for which freight, or a gross sum as compensation for her use, was to be paid, will not his change of voyage have the same effect as the actual performance of the voyage thus prevented, and the actual return of the vessel to the stipulated port, and'subjecthimto the payment of full freight, or the entire sum contracted to be paid, for the use of the'brig 1 And will not this immediate right to his reserved freight or compensa *366 tion for the vessel, and his right to her restoration, fully satisfy his just claims under the charter-party 1
But take another view of the case. Was the brig bound by the charter-party to return direct to Boston, or had she not by fair construction a latitude to touch at intermediate ports in the iter of the voyage, so that Boston was constantly kept in view as the ultimate port of destination ? The terms of the contract are, that she is to proceed to the east coast of South America and back to Boston, and on her return to that place to be delivered up*; and the charterer is to pay for the use of the vessel a monthly compensation for each month she should be employed in the service^ and not a gross sum for one entire voyage. There is no express covenant in the charter-party binding the charterer to return with her direct to Boston. And the provision for a monthly freight or compensation for the use of her during the time she should continue in the service, likens it more to a general contract upon time, allowing a latitude and range of employment, than a contract for a specific voyage to a designated port, and then directly back to the port of departure. And the subsequent agreements in the contract for the right of purchase and sale of the vessel at given period^on stipulated terms, strongly favours that construction. For it vested in the charterer a species of equitable ownership, and was calculated to impress on his agent the conviction, that he had a discretionary authority for her employment, and was at liberty so to order her return voyage, and to take such freight for the ports in the immediate route for Boston, as should best sub-serve his interest.
Malyne, in his Lex Mercatoria, states the case of a ship chartered by a merchant, who engaged the master and crew, equipped the vessel at his own cost, and by the charter-party engaged to pay the owner £20 for the use of her per month, until she should return into the Thames. The merchant loaded the ship for the straits, and to sail from port to port to different places; and after the expiration of two years she sailed from Barbary for London with a cargo, and was lost in a storm near Dover. The cargo was saved, but the merchant refused to pay the freight, because *367 the ship had not returned into the Thames. It does not appear whether there was any legal excuse on his part or not; but Malyne pronounces the merchant wrong, because the freight was designated by the month, and the place of ultimate return was only specified in order to ascertain the time when the freight would be payable. So in this case, the freight was designated by the month, and Boston, the place of ultimate destination, is specified to ascertain the time when the freight would be payable.
But suppose the true construction of this charter-party to require that the brig should return direct to Boston. Did her touching at New-York to deliver the goods taken on freight for that port vacate and rescind the contract 1 Suppose the deviation to amount to a change of voyage, and conceding that it was the act of the charterer, could it absolve him from his covenant to pay the stipulated monthly rate of compensation 1 or would not the legal effect and operation of it, on the principles before stated, be to dispense with the return of the vessel to Boston, as a condition precedent to the right of action against him on the covenant for the charter money, and entitle the owner to an immediate action 1 But was the voyage on which the brig sailed anew or different voyage from that described in the charter-party 1 Or was her proceeding to New-York a deviation only from the voyage to Boston 1 The case states that she cleared for New-York and,Boston: part of the goods were deliverable at New-York, and the residue at New-York or Boston, and the instructions of the master were to proceed to New-York, and there deliver the goods shipped for that place, and then wait the further instructions of the charterer.
Her clearance and the instructions both show that she was bound to Boston, after touching at New-York for the delivery of a part or the whole of her cargo, according to the instructions of the charterer. It was not at New-York, but at Boston, that the voyage was to end, and to which she Was to return. The owner, by taking the possession and control of her at New-York, and divesting the charterer of all further power over her, prevented her return to Boston, and the fulfilment of the engagement to deliver her to.him.at that place. *368 The charter-party did not require the brig to return to Boston with a cargo.
The only expressions in it, which intimate any such intention, are in the description of the voyage back to Boston, where she is to be discharged, and in the allowance of thirty days after her return to that port, for payment of the freight. But these provisions aptly apply to the case of her return with a cargo, which she had a right to do, and probably expected to do. But the Covenants, on the part of the charterer, for the payment of the charter-money, and the re-delivery of the vessel to the owner point to the return of the vessel and not to the discharge of the cargo. He stipulated to pay the hire of the vessel in thirty days after her return to Boston, and to deliver her to her owner on her return. She was on her way back to Boston, and but for the intervention of the owner, would, we are to presume have returned to that place. She was intercepted at the intermediate port, where she had touched, and was from that cause unable to complete and end the voyage. The orders to her master were not to terminate the voyage at New-York, but to wait there for the instructions of her charterer for the voyage. To what could these instructions refer 1 Clearly to the discharge of the residue of the cargo, which was shipped for the account of the charterer himself, and was to be delivered at New-York or Boston as he should direct. He might have directed the brig to proceed with that lading to Boston, and, even if his intentions were to direct her discharge at New-York, until his directions were given, her abandonment of the voyage was not complete. It continued a mere deviation from which the vessel might return or not, and as to-which her election was not yet made and could not be known; Nor did it follow, that she would end the voyage at New-York, even if she discharged her whole cargo there. She might, and most probably would, if unmolested, have returned to Boston, either with part of her lading, or in ballast, and in either case she might have satisfied the terms of the. charter-party. The owner had no interest in her returning to Boston with a cargo; for he would have no lien upon such cargo for his freight. He had *369 taken the personal covenant of the charterer for his security, and trusted to his solvency. The only ground he could have to complain, was the deferring the payment by postponing the time of the return, from which the credit of thirty days was to commenee. But as an equivalent for that, the monthly payment of the hire would continue to run, up to the time of the arrival.
In the actual state of things, which was produced partly by the act of the charterer in deviating from the direct voyage to Boston, and partly by the owner, in dispossessing the charterer of the vessel, and taking her into his own charge, it cannot be known with certainty whether the vessel would have proceeded on to Boston, or the voyage have terminated at New-York; and credence must therefore be given to the documentary evidence which shows an intention to proceed to Boston. If so, the vessel did sail on her voyage to Boston, but with the intention first to stop on her way, at New-York, and which intention she carried into effect. Was this, in the legal acceptation of the term, a change of voyage or a deviation from the original voyage ? The criterion established by our courts for distinguishing between a change of voyage, and a deviation, is, whether the termini of the voyage are preserved or not. If the voyage, upon which a ship sails, have the termini of the voyage described in the contract, the indentity of the voyage is preserved; and if she touches or trades at intermediate ports in the course or track of the voyage, she deviates only, but does not desert the voyage. In all the cases the question of deviation or change of voyage turns on that distinction.
In the case of Henshaw v. The Marine Insurance Company, [2 Caines’ R. 274.] the principle was strikingly exemplified. That was the case of an insurance upon the vessel. The voyage described in the contract and for which the insurance was made, was at and from Newry, in Ireland, to New-York. Previous to her sailing, the master, in conjunction with the agent of the assured, entered into a written contract to land some passengers at Halifax in Nova Scotia under a penalty of ¿£500. She cleared for New-York, but sailed on her voyage by way of Halifax. She there landed her passengers and afterwards arrived safely at New *370 York, the port of her ultimate destination. In an action on the policy for a loss, which happened before the vessel came to the dividing point, the court ruled, that the intention to touch at Halifax, did not make it a different voyage. The argument of the defendant was, that a settled plan and intention to alter the voyage destroys the contract; and that a voyage from Newry to Halifax, and then to New-York, coiild never be the same as a voyage from Newry direct to New-York. But the court held that the termini of the voyages being the same, neither the intention to touch at an intermediate port, nor the actual touching there, made them distinct voyages.
The same rule prevails in the English Courts. Thus where the captain, on a voyage from Pión duras to London, took a consignment of goods for Amsterdam, it was held not to change the voyage. And in Kewley v. Ryan, [2 H. Bl. 343.] where the ship was bound from Grenada to Liverpool, but was to touch at Cork, the identity of the voyage was not destroyed by the deviation. And in the Supreme Court of the United States, in the case of the Marine Insurance Company v. Tucker, 3 Cranch’s R. 375. where the voyage as described in the policy, was at and from Kingston in Jamaca to Alexandiia in Virginia, and the vessel took freight for Baltimore as well as Alexandria, intending to touch at Baltimore ñrst, and was captured while in the common track to both places, the court held, that as the final port of destination or terminus ad quern was not changed, the vessel had sailed on the voyage insured.
These cases all arose on policies of insurance, where the underwriter has no covenant of the assured to protect him, and must rely on a strict observance of the contract for his safeguard against abuse. Añd, if so much latitude is allowed to the assured in the construction of their contract with the insurers, the charterer ought not to be held to a stricter rule with the ship owner, to whom he is bound by personal covenant for his fidelity to his engagements, and is liable to damages for every deviation from them.
In 3 Lev. 41. we find the report of the case of Cole v. Mallett. It was arr action of covenant on a charter-party, by -which the *371 master of the ship covenanted to sail with the first fair wind to Barcelona, and that the mariners should attend with a boat to re-lade the ship, and then to return with the first fair wind to London, and unlade and deliver the cargo; and the freighter covenanted to pay freight and demurrage. The master brought his action for the freight and demurrage. The defendant pleaded, as to the freight, that the ship did not return direct to London, but went to Alicant and Tangier, and made divers deviations, and by those delays the goods were spoiled : to which the plaintiff demurred, and judgment for the plaintiff, for that the covenants are mutual and reciprocal, upon which each shall have his action against the other, but shall not plead the breach of one in bar of the other; for perhaps the damages of the one side and of the other are not equal. In that case, the master kept the government and controul of the ship, and covenanted to carry the goods of the merchant: consequently the deviation was his act. And it was surely as much a change of voyage as this. The deviation from the track of the voyage from Barcelona to London, in going to Alicant and Tangier, was quite as material as that to New-York, from the track of the voyage from South America to Boston. Yet the deviation was held not to dissolve the contract.
In this case, the vessel was let to the charterer, who took the. exclusive possession and controul of her, appointed the master, and by his agents conducted the voyage, and received on board the freight for New-York. Then surely the breach by him of his implied covenant to return with the vessel direct to Boston, and there discharge, admitting it in its broadest latitude and fullest force, by taking freight for Ñew-York, and proceeding to that port to deliver it, could not operate to vacate or dissolve the charter, or absolve him from his covenant to pay the freight, nor give the owner of the vessel a right to re-enter, dispossess the master of the vessel, and hold the goods of the general shippers for the payment of the freight secured by the bills of lading to him as owner.
It must often happen, that a freighter who charters a ship for a distant voyage, will meet with unforeseen occurrences, which prevent the strict and literal observance of all the conditions of the charter-party, and impose on him the necessity or expediency of *372 deviation from the voyage prescribed by the contract, as the only means of avoiding a ruinous sacrifice. His deviation, if not fully and entirely justified by the exigency of (he case, will expose him to damages for the breach of his covenant. Exit if he preserves the substantial features of the contract, and adheres, as far as reasonably practicable, to the general course and ultimate termination of the voyage prescribed to him, he cannot be said to forsake or abandon the charter-party.
In the case before us, the brig sailed from South America for Boston, by the usual and accustomed route, and the port of New-York, at which she was to touch, was in the course, and as it, were, the very iter of her voyage. Can she then be said to have forsaken or wholly disregarded the charter-party ? An advantageous and tempting freight offered for a port in the direct course of the voyage, and the immediate vicinity of the port of destination mentioned in the charter-party. The charterer, who by his controul of her, was the absolute owner of the ship for the voyage, and as the reward for the use of her was to pay a gross sum for each month she was employed in his service, agreed to take the freight for the intermediate voyage, but kept his eye steadily upon the port of destination to which he was bound by the charter to proceed. His voyage ivas for Boston, by w'ay of New-York, and the latter port being in the course of the voyage to the former, that voyage was not abandoned or superseded, but was preserved, and intended to be performed; and if the deviation from it, by touching at New-York, was not warranted by the contract, it was a breach of the implied covenant to proceed direct to the contract port of destination, and the charterer would be liable to the owner for all the loss and damage which that deviation might occasion. But that breach of covenant could not dissolve the contract or vacate the charter-party. It wrould be a most alarming principle to establish, that every breach of the covenants of a charter-party by the charterer, should annul the contract, and give the owners a right to resume the ownership of the vessel, and dispossess the charterer.
Suppose the brig, in the case of the voyage from Newry to New-York, in the case cited from Caines, or the ship in the Voyage from the West Indies to Alexandria, in the case cited from Cranch, *373 had been under charter for tiróse voyages, and the master appointed by the charterers: could the owners have taken possession the vessels at Halifax, or Nrfolk, turned out the charterer, and his captain, and broken up the residue of the voyage 1 What was to become of the goods shipped in the one case for New-York, or in the other for Alexandria? The charterer was absolute owner for the voyage described in the charter-party, and had a right to contract with general freighters by bill of lading, to convey their goods in his vessel from the port of departure to the port of destination for freight. His charter-party was Ms title, and the shippers were bound to look no further for his right to contract with them. Could the contract be defeated by his subsequent deviation from the track of the voyage, to deliver goods subsequently taken on freight for others 1 Such deviation might give them claims to damages for any loss of insurance or other injury they might sustain by it, and it might also give a cause of action to the owners of the vessel; but it surely could not dissolve the charter-party.
But again. Could the owner, by possessing himself of the vessel against the will of the charterer, as for a breach of his own contract of hire, substitute himself for the charterer in Ms contract with the shippers, and enforce performance of them 1 The claim of the owner was to the gross monthly sum agreed to be paid for the hire of the vessel, and for that his remedy was against the charterer personally, and the charterer could not defeat that remedy by his own act in deserting the voyage prescribed by the contract, and substituting another in its place. What title, then, could the owner make to the freight payable by the sMppers % The contract of the shippers was with the charterer as owner pro hac vice, and they have no privity with the general owner. If he assumes the possession of the ship, as forfeited by the deviation of the charterer, he must surely take it subject to the contracts of the charterer. His claim for his payment must still be against the party with whom he contracted, and the obligation of the shippers to the party who contracted with them.
Suppose the freight had been paid in advance, would they be compelled to pay it over again ? Or if they had legal matter of *374 set-off against the charterer, could their just rights be defeated'? It cannot be contended that the shippers, who are strangers to the charter-party, and never contracted with the owner, can be bound or their goods liable for the whole monthly hire of the ship. And yet that is the amount’ which, by his contract, he was entitled to demand.
But the ship-owner’s right to freight of the shippers’ goods, is placed on the ground of lien. How was that lien acquired 1 He had no possession of the brig at the time the goods were shipped, nor until after her arrival at the port where the goods were deliverable. The freight, which then became payable, was due to the charterer. How could the right to that freight be transferred without his consent to another 1 The ship-owner regained the possession of the vessel by his entry; but it does not follow, that the immediate ownership and right of possession reverted to him, or became revested in him by his re-entry, or that the right to the freight payable by the general shipper to the charterer, or the lien for it upon the goods, was tranferred or accrued by his entry and possession to him.
It has been my endeavour to show, that the personal covenant of the charterer contains the remedy of the ship-owner for the monthly sum or compensation stipulated by the charter-party for the use of the vessel, and that the further remedy he may have acquired for it, is an immediate right of action for the demand. And the views I have taken of the case, have resulted in the opinion, that the ship-owner, whatever his other rights in the premises may be, did not by his entry upon the charterer, and repossessing himself of the vessel, acquire or become entitled to a lien on the goods for freight, and that the plaintiff must have judgment.
Oaklet J.
The first ground on which the plaintiff’s right of recovering is resisted, is, that Woods, as the general owner of the vessel, had a lien for the freight on the goods found on board, when he took possession, notwithstanding the provisions of the charter-party.
It is well settled, that the owner of a ship has, by the general rules of law, a lien on the cargo for his freight, although the vessel *375 may be hired to another, provided he continues in the actual, or constructive possession and control of it, His right of lien depends upon his possession. If that is parted with, the lien is lost. In Clarkson v. Coles, [4 Cowen, R. 470.] the Supreme Court lay down the rale to be, that when the general owner of a vessel parts with his ownership and possession, to a charterer, the latter is considered owner for the voyage, and the former has no lien for the freight. The court in that case, reviewed the principal cases on the subject, and they fully support the doctrine laid down. In Chandler v. Talbot, [18 John. R. 157.] Chief Justice Spencer says, “ the right to retain the cargo for the freight, has grown out “ of the usage of trade, and it does not exist where the parties “ have regulated the time and manner of paying freight, by “ stipulations in a charter-party; and especially if the cargo is “ deliverable before the arrival of the period of payment.”
These principles, which are well settled, furnish the rule of determining the validity of the first ground of defence set up in this case. It cannot be doubted, that by the terms of the charter-party in question, the entire ownership and possession of the vessel for the voyage, were transferred to the plaintiff. He was to appoint the captain, who of course became his agent; and an express stipulation is inserted, that he should deliver the vessel to the owner on the termination of the voyage. These provisions in the charter-party are altogether inconsistent with the idea, that the owner retained any possession of the vessel, or had any control over her, during the continuance of the voyage. It is also provided, that the freight reserved in the charter-party, shall not be payable until thirty days after the termination of the voyage. There being no stipulation that the cargo should remain on board during that time, it follows, in the language of Chief Justice Spencer, that the cargo “ was deliverable before the arrival of the “ period of payment,” of the freight.
The present case, as far as the first ground of objection to the plaintiff’s recovery is concerned, falls entirely within the principles of Clarkson v. Coles, and Chandler v. Talbot.
The second ground upon which the plaintiff’s right of recovery is resisted, is, that the vessel having touched at New-York, without *376 necessity, on her return voyage, and having thus departed from her direct route, the charter-party was thereby violated by the plaintiff"; and that Woods, the general owner ot the brig, hadaright to consider it as abandoned, and to resume the possession of the vessel; and that having thus regained the possession, his right of lien for freight attached upon the goods found on board.
When the goods shipped at Rio Grande, and consigned to Whitlock, at New-York, were put on board, it is clear that the contract for the payment of the freight was made by the shipper with the plaintiff. The plaintiff being owner of the vessel pro hoc vice, had a right to take the goods on freight; and the shipper having contracted to pay the freight to him, was bound to do so, on the delivery of the goods to the consignee, at New-York; unless he was discharged from that obligation by the alleged violation of the charter-party by the plaintiff. I am at a loss to conceive how any such violation, if it took place, could authorize the shipper or his consignee to refuse to pay the freight, when it had been earned according to the terms of his agreement with the owner of the vessel.
It seems clear, that on the arrival of the vessel at New-York, the obligation to pay the freight to the plaintiff became complete on the part of the shipper, or his consignee: and if so, it is equally certain that he could be under no obligation to pay it to the general owner of the vessel. The freight might have been paid in advance to the plaintiff; or the payment might have been postponed by agreement to a day subsequent to the delivery of the goods; in either of which cases, it could not be pretended that the general owner of the vessel could have retained the goods, though the charter-party may have been abandoned, or annulled with the consent of the plaintiff. The terms of the agreement between the plaintiff and the shipper of the goods, could not have been affected by the interference of any claims, on the part of the general owner. And the trae ground, as it appears to me, on which the decision of the case ought to rest is, that as between the shipper, or his consignee and the plaintiff, the right of the latter to claim the freight, could not be questioned by the former; and that the consignee could not have paid it to Woods, the general owner, ex *377 cept in his own wrong. The payment to the defendant, who was the agent of the plaintiff in taking the goods on board, and in earning the freight, by the completion of the voyage, was equivalent to a payment to the plaintiff; and the money must be considered as paid for the plaintiff’s use, because it was paid in discharge of the contract made with him, by the shipper of the goods.
The case would stand thus, in my judgment, though it were conceded that Woods had strictly a legal right to take possession of the vessel, on her arrival at New-York. But had he such right 1 The position is, that by a departure from the direct route of the voyage' from Rio Grande to Boston, and touching at New-York, although with the intent to terminate the voyage at the latter place, the general owner of the vessel was authorized to dissolve the charter-party, to resume the possession of the vessel, and to demand payment of the freight of any goods he might find on board; not in pursuance of the terms of the charter-party, but as upon a quantum meruit. These are consequences which can scarcely flow from so unimportant a deviation from the direct line of the voyage.
The charter-party clearly continued binding on the plaintiff though the vessel touched at New-York, and would continue to operate until her arrival at Boston, unless the interference of the general owner, and the consequent breaking up of the voyage, discharged him from it. The owner, then, lost no security for his freight, in consequence of the touching of the vessel at New-York. He relied originally on the personal responsibility of the plaintiff and assumed the hazard of his becoming insolvent. He has no ground of complaint, unless it be that the voyage might have been somewhat lengthened, and the period at which the payment of freight, according to the terms of the charter-party, was to become due, might have been postponed for a few days. This consideration is of little importance, when it is recollected, that the freight is charged at a certain sum per month, during the continuance of the voyage: and that the voyage itself was therefore understood by the parties to be one of indefinite length. And indeed, the provision in the charter-party, that the voyage is to *378 terminate at Boston, may justly be considered as inserted, rather for the purpose of fixing a period, from which the time limited for the payment of the freight may begin to run, than to confine the homeward voyage to the most direct route from Rio Grande to that place. If the deviation from the direct route of the homeward voyage can be considered at all as a violation by the plaintiff of the terms of the charter-party, the owner of the vessel may, probably, have his action for the damages, if any, which he may have sustained in consequence of it. But I know of no principle upon which the owner, under such circumstances, is justified in treating the charter-party as a nullity.
The preceding view of this case agrees with that taken by the S. C. of Massachusetts, in the case of Pichnan v. Woods, in which the same questions were involved, arising under the same charter-party. We have been furnished with a manuscript copy of the opinion delivered by C. J. Parker, in giving the judgment of the court in that case. It was an action of replevin for certain property, the proceeds of the cargo, shipped by Lander under the charter-party in question. The cargo was assigned by Lander to Pickman; and on the arrival of the vessel at New-York, Pickman claimed the property under his assignment, which Woods refused to deliver, unless the freight was paid. The same questions existed as in the present case. 1st. Whether Woods had a lien on the goods for the hire of the vessel, by virtue of the charter-party. 2d. If not, whether, in consequence of the vessel’s going to New-York, the charter-party ceased to be binding on Woods, so that he might resume the possession of the vessel, and acquire a right to freight on such goods as he found on board. Both these questions are examined at length by the Chief Justice; and he comes to the conclusion, that Woods, by the fair construction of the charter-party, had transferred the entire possession and control of the vessel to Lander, and could not claim a lien for the freight upon any goods taken on board by him ; and that the vessel’s touching at New-York, under the circumstances, did not authorize Woods to consider the charter-party as dissolved; and judgment was given for Pickman.
*379 This is an adjudication of a court of high authority on the very points involved in the present case, and is entitled to great respect. I am entirely satisfied with the correctness of the de'cision, and with the reasoning on which it is founded.
The defendant, then, in the present case, having received the freight in question from the consignee of the goods, is to be held to have received it for the use of the plaintiff; and having paid it over with full knowledge of the plaintiff’s rights, he is liable to the present action. The plaintiff must have judgment for the amount of the freight, with interest, according to the stipulations of the case.

Judgment for the plaintiff.

fR. M. Blatchford, JtWyfor the plff. H. & E. Wilkes, JlWysfor the deftrj

 The defendant’s counsel had presented to the court a written opinion of the late Chancellor Kent.