Rives, J.
Recent decisions of the Supreme Court of the United States have regarded and treated corporation and municipal bonds, with coupons, payable to bearer, as negotiable instruments. Moran v. Commissioners of Miami County, 2 Black’s U. S. R. 722; Mercer County v. Hacket, 1 Wall. U. S. R. 83; Gelpcke & al. v. City of Dubuque, Id. 175; Thomson v. Lee County, 3 Wall. U. S. R. 327. They are negotiable securities, having all the qualities and incidents of commercial paper, and imparting to the holder a perfect title by delivery. This doctrine proceeds not only on grounds of public policy, but is designed to effectuate the intentions of the parties. Justice Wayne, in delivering the opinion of the' court in Moran v. Commissioners of Miami County, says, with great propriety, that such bonds,' with their interest warrants, are commercial securities, though they be not in the accustomed form of promissory notes, or bills of exchange, and that the parties intended them to be passed from hand to hand to raise money upon them, so that a full title was intended to be conferred on any person who became the legal holder of them.”
These bonds of the city of Wheeling, and their coupons, *755 are conceded to belong to this class of securities. The bond itself is payable to bearer “ at the banking house of Duncan, Sherman & Co., in New York, on or before the 1st day of July, 1872, with interest thereon at the rate of six per centum per annum, payable half-yearly at the said banking house on the first of January and the first of July in each year, from the date of this bond, and until the principal be paid, on presenting to the said banking house the proper coupon hereunto affixed.” The coupon is in a peculiar form ; it is not, as is most usual, a mere warrant, ticket or memorandum for such an amount, payable at a certain place and time. In my view of this case, the legal nature of this coupon constitutes the very gist of this controversy. I shall, therefore, be excused, for illustrating it by comparison of forms taken from adjudged cases. In Woods v. Lawrence County, 1 Black’s U. S. R. 386, it was nothing more than a memorandum of the interest due, and of the time and place of payment. It was in this form :
“Lawrence County.
“Warrant No. 37, for thirty dollars,
“ Being for six months interest on bond No. , payable on first day of January, A. D. 1873, at the office of the Pennsylvania Railroad Company, in the city of Philadelphia.
“130. -, Clerk”
Here there was a precise stipulation of the amount, and of the time and place of payment.
The Wheeling coupon, it will be seen, materially differs from this; it is more like that given in the case of Sheboygan County v. Parker, 3 Wall. U. S. R. 93. There, it was said, “ the interest warrants or coupons were not in the usual form of promises to pay, or of declarations that so much money was due the bearer at the semi-annual dates, but were drafts by ‘ Lewis Curtis, President of the Board *756 of the Sheboygan Railroad Commissioners,’ on the treasurer of the county of Sheboygan, in favor of the bearer for so much, and was signed by Williams as ‘secretary,’ ” The record in this case gives us a sample of the Wheeling coupons, and it is as follows :
“ Coupon, city of Wheeling, guaranteed by the State of Virginia. Duncan, Sherman & Co., of New York, will pay to the bearer thirty dollars, the half-yearly interest on Wheeling bond 269, due 1 January, 1867.
“130. M. Nelson, Mayor.
This is ..clearly a check on a banking house, nor is any time appointed for its presentation. The date specified merely designates what half-yearly interest constitutes the amount of the check. It is not a draft on this house to pay on 1 January, 1867, to bearer, thirty dollars, being the half-yearly interest due on that day; but it is like all other checks, payable on presentation, without the appointment of any day therefor, and the concluding phrase of the check is merely designed to make it, when paid, a voucher for the discharge of the half-yearly interest due on 1 January, 1867.
The city of Wheeling, when enabled by the act of 20th March, 1848, to secure the State’s guarantee upon her bonds as the means of making and securing her subscription to the capital stock of the Baltimore and Ohio Railroad Company, did not avail thereof until after the passage of the act of 29th March, 1851, “ authorizing the issue of coupon bonds.” This policy was doubtless dictated by the advantages found to attend this form of securities. By virtue of this change, two points were gained tending to facilitate the negotiability and marketable value of these securities : first, by making the principal and interest payable at places more eligible than that of their emission; and secondly, by attaching interest coupons, which, upon being severed from the bond, admitted of an independent *757 and separate circulation. It is to be presumed, therefore, that the city of Wheeling, in awaiting this act and framing its securities thereby, had a special object in view; and that was, to conform them to the wants of trade, and endue them with the attributes of the most favored commercial paper. This was accomplished by selecting the city of New York as the place of payment, and putting the coupons in the shape of checks upon one of the leading banking firms of that city. This was doubtless effected by special treaty with these bankers, who, either out of funds to be provided by the city of Wheeling or advanced by themselves, agreed to pay these coupon checks or drafts when presented. These securities, therefore, possessed all the additional value to be derived from their redeemability in the great centre of national exchanges, and the premium they would bear on this account, in the more distant markets of the States. It was readily foreseen that from this cause the coupons especially would become, for small sums, a convenient form of Northern exchange, and, in fact, possess the faculty of a uniform currency at a time when the different values of bank notes made such paper most desirable for circulation. Had these bonds been payable in the usual form by Wheeling, and the coupons, mere warrants for the interest, it is needless to say how much their value would have been affected and their circulation restricted by such a condition. Upon these instruments the guarantee of the State has been impressed according to the import, and in the very terms of the act authorizing it. Now, then, if Wheeling has derived particular advantages from the form she has chosen to give to her securities, and the inducements she has thereby offered the public to deal in them, it is neither for her nor her guarantor to escape legal liabilities arising out of the special nature of her contract with her creditors or those who, as Iona fide holders, stand in their stead and possess their rights.
*758 The coupons, that form the subject of this controversy, were for the amounts of semi-annual interest falling due 1st of January and July, 1862, 1st of January and July, 1866, and the 1st of January, 1864. They had been paid and taken in by the State, and afterwards abstracted from the office of the Second Auditor. In November, 1864, the appellant, not knowing that they had been abstracted from said office, bought them of the Farmers Bank of Virginia, and thus became the bona fide holder of them for value. Under this state of facts, the appellant’s title to recovery would be clear if it were not for the question that has been raised that these coupons were overdue, and thus open to equities existing between the original parties. As to the principle of law involved, there is no dispute. In Fowler v. Brantly, 14 Peters’ R. 318, it is said, “a note overdue or a bill dishonored is a circumstance of suspicion to put those dealing for it afterwards on their guard, and in whose hands it is open to the same defences it was in the hands of the holder when it fell due. After maturity such paper cannot be negotiated.” To the same purport is our own decision in Davis v. Miller, 14 Gratt. 1. But vrhen were these coupons mature? It has been assumed that the date, by which the half-yearly interest was designated as due, and for which the coupon was given, was also the date of its maturity. But I have heretofore endeavored to show that such is not the case. A slight attention to the wording of the coupon, satisfactorily dispels that false gloss. But resort is then had to the body of the bond, to prove that such is the meaning of the coupon. They are treated as inseparable; and it is contended that one must be explained by the other. .While I hold them to be distinct, and differently framed so as best to subserve their respective ends, I concede the propriety of construing them as a whole. Let us, then, examine the bond, and ascertain from its language whether the payment of inter *759 esfc is confined to the half-yearly dates; or whether it is not made to depend, as I contend, upon “ the presentation of the proper coupon.” These are the words: “with interest thereon at the rate of six per centum per annum, payable half-yearly at the said banking-house on the 1st of January and 1st of July in each year from the date of this bond, and until the principal be paid, on presenting to the said banking-house the proper coupon hereunto affixed.” We must give a consistent interpretation to the whole phrase; it would scarcely be reasonable to treat the condition of presentation as surplusage; therefore, we must hold it as meaning that while the interest is due as described, it is not to be paid but upon “ the presentation of the proper coupon.” My understanding of the coupon, then, corresponds exactly with the construction I place upon the bond.
Whether, therefore, I consider the bond or coupon separately or construe them together, I am constrained to believe that the latter is neither more nor less than a check, draft or bill of exchange, payable on demand. These three terms denote very nearly the same thing; and so far as any important legal consequences follow, may be deemed convertible terms. Thus, in Keene v. Beard, 98 Eng. C. L. R. 371, it was held, that “a check on a banker payable to bearer, was a negotiable instrument, and passed by endorsement so as to entitle the holder to sue the endorser thereon as in a ease of a bill of exchange.” Erie G. J. said, “a check is strongly analogous to a bill of exchange in many respects. It is drawn upon a banker, and though in practice the banker does not accept the draft, he might, for aught I know, do so. A check has also some of the incidents of a bill of exchange, if not all, as in respect of its passing by delivery, and also in respect of a bona fide holder taking it for value having a better title than the person from whom he received *760 it.” Byles J. is more discriminating in his language; lie says, “I conceive that a check is in the nature of an inland bill of exchange payable to the bearer on demand. It has nearly all the incidents of an ordinary bill of exchange. In one thing it differs from a bill of excha.nge: it is an appropriation of so much money of the drawer’s in the hands of the bank on whom it is drawn for the purpose of discharging a debt or liability to a third person; whereas it is not necessary that there should be money of the drawer’s in the hands of a drawee of a bill of exchange. There is another difference between the two instruments: in case of a bill, the drawer is discharged by default of due presentment; but in the case of a check, the drawer is not discharged by delay of presentment, unless it be shown that he has been prejudiced thereby; for instance, by failure of the banker, on whom it is drawn. In all other respects, a check is precisely like an inland bill of exchange.” The principles of these decisions have been closely followed in our American courts. In Cruger v. Armstrong and Barnwall, 3 Johns. Cas. 5, it was held that a check, like a bill, should be presented for payment; and the following language was employed by the judges: Ratcliffe J.—“A check, though generally received as cash, when given in* payment, is, in form and reality, a bill of exchange. It possesses all the requisites of a bill, and has been so treated. It has been held to be negotiable, and may be declared upon as' a bill of exchange. (Chitty 16; 7 T. R. 423.) The draft itself implies that payment is to be demanded of the drawees. The person who takes it receives it on that condition. It is accordingly considered not as due from drawer, until such demand has been made and drawee refuse payment.” Kent J.—“A check is not due until demanded, and even independent of authority, I consider this to be the import and nature of the agreement. The drawer undertakes *761 specially that the money shall be paid by the person on whom the check is drawn, and the money is supposed to be appropriated for that purpose in the drawee’s hands. It would be unreasonable and contrary to the agreement for the holder, instead of resorting to the fund in the hands of the drawee, to make his demand promptly and in the first instance of the drawer himself. The drawer may not have the means of payment, except from the fund pointed out, and that fund may be at a distance, and in the mean time his credit will suffer by drawing a check which he.cannot instantly pay. He must not be understood as promising to pay, except upon the default of the drawee; and as Ch. J. Holt observed in Tassell and Lee v. Lewis, (1 Ld. Raym. 743,) if the payee does not like the check or that mode of payment, he ought to refuse it; but having accepted it, it is at his peril.”
I have thus given at some length these juridical expositions of the nature, and function, and incidents of checks or drafts on bankers, because I deemed every sentence thereof as having an important bearing and shedding light upon our present enquiry. I do not think it can be successfully denied that these coupons belong to this class of negotiable instruments; and if so, it follows, from these authorities, that they cannot be deemed due until demanded. Parsons, in his treatise on Notes and Bills, vol. 1, p. 2G1, suggests the propriety of substituting for the usual phrase “after maturity,” (and I may add “overdue,”) the more descriptive one of “after dishonor;” because, as he says, “dishonor and non-payment at maturity are not necessarily the same thing: a note on demand is mature and demandable at once, but is not dishonored until a reasonable period of non-payment has elapsed.” Adopting this language, then, as more suitable to this class of commercial paper, let us ascertain when this coupon should be considered dishonored. Parsons, in his *762 treatise already mentioned, after laying down the general principle “that bills or notes payable on demand have no definite time at which non-payment operates dishonor,” proceeds to state “that a reasonable time must elapse before mere non-payment dishonors the bill or note. What is this time, has not been, and cannot be, fixed by any definite and precise rule. One day’s delay of paper on demand certainly would not dishonor it; five years would. And in each case, how many days, or weeks, or months are requisite for this effect, must depend upon the test whether so long a time has elapsed that it must be inferred from the particular circumstances and general conduct of business men, both of which should he considered, that the paper in question must have been intended to be paid within this period, and if not paid must have been refused.” This position is fortified by a great number of cases, which he cites to show that no definite. time can be fixed to predicate dishonor of mere failure of demand; and that every ease must be decided on its circumstances, as tending to forbid or excuse the ordinary diligence. In Borough v. White, 4 Barn. & Cress. 325, (10 Eng. C. L. R. 345,) Littledale J. speaks of the promissory note in that case as “intended to be a continuing security; and that we could not treat it as overdue without evidence of payment having been demanded and refused.” So in Brooks v. Mitchell, 9 Mees. & Welsb. R. 15, Parke J. uses the same term in declaring “that a promissory note, payable on demand, is intended to be a continuing security.”
Upon reason and authority, and the design of the contract, therefore, I consider these coupons, being drafts payable on demand, as continuing securities, and intended to perform the function of bank notes. We all know that like coupons constituted in fact a very convenient currency, and were frequently passed as such in the channels of exchange between the South and North. What cir *763 cumstance of suspicion, then, should have arrested the attention and challenged the scrutiny of the purchaser in this case? It was not the fact of dishonor, because he well knew that from the existing state of war they could ° ^ not have been presented for payment, and that any effort to collect them during the war was an offence against belligerent rights and positive enactments. Their chief value consisted in their being “Northern funds,” which might be held up during hostilities and await collection at the end of the war. There was no mark upon them to show that they had ever been paid or in the possession of the guarantor. The State slept upon her loss and gave no public notice of it till the year succeeding the appellant’s purchase of them. They were offered for sale by, and bought from, one of the State banks and State depositaries—a circumstance peculiarly fitted to satisfy the dealer of the unquestionable validity of the title. The bonafides of the holder is expressly found by the agreed statement of facts. Under such circumstances I can conceive of no grounds of suspicion, or requirement of law exacting of the buyer any precaution beyond that which he took, or subjecting him to any equities which the State may have against the embezzler of these notes.
But it may be objected that in my treatment of these coupons, as continuing securities, I am extending the liability of the State beyond her actual engagement. But such is not the ease. She must stand to the terms of her agreement. Her faith is pledged “for the punctual payment of the interest and the ultimate redemption of the principal sum of money appearing due by the above bond, according to the terms therein specified.” What were 11 the terms specified” as to payment for interest? Clearly, that it should be effected by drafts on Duncan, Sherman & Co. of Hew York, payable on demand to bearer. If, therefore, there is this capacity of negotiability and circu *764 lation impressed upon these coupons, it resulted from the contract of the city of Wheeling, from which she derived commensurate advantages, and which the State has chosen to endorse with her guaranty.
I think it must be admitted that if the appellant has to hear this heavy loss, it is very much due to official neglect in failing to indicate by some mark her redemption of these coupons, and promptly warning the public of their abstraction. There is no pretence of any “ mala fides” on the part of this holder; he is conceded to he innocent and a purchaser for value; and hence, in view of the State’s official neglect, I presume, she can only be relieved from this .responsibility or recovery by some inexorable rule of law, and that is now said to be found in this doctrine of “ overdue.” I have endeavored to show by reasoning and authority that it is not applicable to these coupons; and that it is due alike to the contract of Wheeling and the guaranty of the State to maintain their negotiability till after presentation. It is expressly found that they were presented within a reasonable time after the restoration of commercial intercourse between Richmond and New York; and I am clear that the existence of the war was a fact releasing the holder from the duty of presentation during its continuance.
For these reasons I am constrained, though with diffidence, to dissent from the affirmance of the judgment below.
Joynes, J.
This proceeding was instituted under the provisions of the Code which authorize proceedings against the Commonwealth by “ any person having any pecuniary claim against the Commonwealth upon any legal ground.” Code ch. 45, § 11, ch. 46, § 1. The claim is founded upon the guaranty of the Commonwealth, endorsed by the treasurer upon certain bonds of the city of Wheeling. It is *765 objected, on behalf of the Commonwealth, that the guaranty thus endorsed was not authorized by the act of March 20, 1848, in pursuance of which it purports to have been made, because the obligations on which the guaranty was endorsed are not “bonds,” in the strict common law sense, and because they are not made payable to the Baltimore and Ohio Railroad Company. There is nothing in either of those grounds. The act of March 20, 4848, authorized the treasurer to endorse the guaranty of the Commonwealth, in a prescribed form, “ upon the bonds of said city [of Wheeling] to be executed in payment of her subscription ” to the stock of the Baltimore and Ohio Railroad Company, to the amount of $500,000. Before the guaranty authorized by this act was endorsed, the act of March 29, 1851, was passed, by the third section of which it was provided, that “ any company or corporation authorized by law to issue bonds to be guaranteed by this State, and which have not been issued, may attach coupons thereto, and make the money and interest owing upon such bonds, payable at such place or places in the United States or elsewhere as the company or corporation may" select.” This section, literally construed, only authorizes coupons for interest to be attached to the bonds guarantied, and does not authorize the bonds themselves to be made payable to the holder, or transferable by delivery. But this section must be construed with reference to that which immediately precedes it, by which provision is made for the issue of bonds payable to the holder, with coupons for interest transferable by delivery, for money borrowed for the State by the Board of Public Works. This act was the first which provided for the issue of what are now known familiarly as “ coupon bonds.” Construing the third section in connection with, and with reference to, the second, it authorized bonds which were to be guarantied .by the State to be issued in the form of “ coupon bonds,” *766 that is to say, payable to such person as might be the holder, and with coupons for interest transferable by delivery. And such was the construction put upon this section in practice.
The act of March 20, 1848, did not require that the bonds should be made payable to the Baltimore and Ohio Railroad Company. The subscription of Wheeling was to be paid to the company in bonds of the city, guarantied by the State, but whether the bonds should be made payable to the company was left to be arranged between the city and the company. But if there could be any doubt on- this point under the act of March 20, 1848, there can be none under the act of March 29, 1851, which provided for bonds payable to the holder. I conclude, therefore, that the treasurer was fully authorized to endorse the guaranty of the State on these bonds. And the Legislature, by the act of January 10, 1867, recognized the validity of the guaranty.
The act of March 29, 1851, in terms, makes the coupons “transferable by delivery,” but does not, in terms, make the bonds themselves “ transferable by delivery.” This, however, is implied in the provision that they shall be “payable to the holder,” the obvious intent being that they shall be payable to such person as may, from time to time, be the holder. These bonds, therefore, as well as the coupons, pass from hand to hand by delivery. And it has been held, in numerous cases, by the Supreme Court of the United States, and by the highest courts of many of the States, that such bonds and coupons are negotiable instruments, “ having all the qualities and incidents of commercial paper.” White v. Verm. & Mass. R. R. Co., 21 How. U. S. R. 575 ; Mercer County v. Hacket, 1 Wall. U. S. R. 83; (Gilpcke v. City of Dubuque, Ib. 175; Meyer v. City of Muscatine, Ib. 384; Murray v. Lardner, 2 Wall. U. S. R. 110; Thomson v. Lee County, 3 Wall. U. *767 S. R. 327 ; Supervisors v. Schenck, 5 Wall. U. S. R. 772. See the cases in State courts cited, 1 Smith’s L. Cas. 5th ed. 605; 2 Am. L. Reg. N. S. 595; Beaver County v. Armstrong, 44 Penn. R. 63.
It is also held, that a coupon may be negotiated after it has been separated from the bond, and that the holder of a coupon may recover upon it without producing the bond to which it was attached, and without being interested in it. Commissioners Knox County v. Aspinwall, 21 How. U. S. R. 539; Thomson v. Lee County, 3 Wall. U. S. R. 327; Beaver County v. Armstrong, 44 Penn. R. 63.
In considering the title of the plaintiff to the coupons on which this proceeding is founded, we must, therefore, apply the principles which belong to bills of exchange and negotiable notes.
The guaranty of the State was given in order to promote the credit of the bonds. The form of the bonds indicates that they were designed to be put upon the market. They were not only to be sold in the first instance, but to circulate from hand to hand by subsequent sales. The guaranty was intended to promote the credit of the bonds upon all of these sales, and to enure to the benefit of each holder of a bond and of each holder of a coupon, from time to time, to the extent of his claim.
This is the plain intention of the guaranty, but how the holder of a bond or coupon is to avail himself of it is a question of more difficulty. The right to enforce the guaranty may not pass to each successive holder of a bond , or coupon, so as to entitle him to maintain an action at law upon it in his own name. It is even held, that a guaranty endorsed on a negotiable note is not negotiable along with the note, so as to entitle an endorser of the note to sue on it at law in his own name. 1 Am. L. Ca. ed. 1861. And perhaps there may be greater difficulty in holding that the guaranty in this case passes, as a negotiable in *768 strument, along with every bond and coupon, since by the transfer of a bond and of the coupons upon it, to different persons, the contract of guaranty endorsed on the bond may, in effect, be severed into parts, and enure to the benefit of several persons. We need not decide that question, however. For if the contract of guaranty is not negotiable at law along with the bond and coupons, it is assignable in equity, and an interest in it passes in equity to each successive holder of a bond or coupon. And in this petition it is not material whether the title of the plaintiff is such as would commonly be enforced at law or in equity.
In order to give effect to the manifest intention of the parties, the right to enforce the guaranty, unless lost by laches or otherwise, must be held to be co-extensive with the right to enforce payment of a bond or coupon. The guaranty, as an accessory to the bond or coupon, follows it and adheres to it in equity, and the right to enforce the guaranty must be determined by the right to demand payment of the bond or coupon. If, therefore, the plaintiff is the lawful owner of the coupons, and entitled to enforce the payment of them, he is entitled to enforce the guaranty, and cannot be defeated by any equities that do not affect his claim upon the coupons. And if he cannot recover upon the coupons, he cannot enforce the guaranty.
That the ordinary rule applicable to equitable assignments may thus be controlled by the intention of the parties, and in order to carry that intention into full effect, is sustained by the case of the Agra & Masterman’s Bank, 2 Law Rep. Ch. Ap. 397, decided in 1867 by the Court of Appeal in Chancery. Tho A. & M. Bank gave to Dickson, Tatham & Co. a letter of credit addressed to them, authorizing them to draw bills upon the bank to a certain amount. D. T. & Co. drew bills accordingly, and sold them to the agent of the Asiatic Banking Corpora *769 tion. The A. & M. Bank having failed, the Asiatic Banking Corporation, which still held the bills, carried in a claim for the amount of them under the winding-up of the A. & M. Bank. The claim was opposed on the ground that D. T. & Co. were indebted to the A. & M. Bank in an amount exceeding what was due on the bills. The argument was, that there was no contract except with D. T. & Co., and th'e Asiatic Banking Corporation could only claim as equitable assignors, and subject to the state of account between the bank and D. T. & Co. But the Lords Justices held, that the intention was, that persons taking bills on the faith of the letter of credit should have the absolute benefit of the undertaking contained in it, without reference to any collateral or cross claims, and allowed the claim of the Asiatic Banking Corporation. Lord Cairns (the present Lord Chancellor) was inclined to think, that upon the offer contained in the letter of credit being accepted and acted on by the Asiatic Banking Corporation, there was created a valid and binding contract at law in favor of said corporation against the A. & M. Bank. This case was approved and followed in In re Blakely Co., 3 Law Rep. Ch. Ap. 154, relating to the transfer of debentures payable to bearer, and held not to be negotiable at law, but only assignable in equity. The result is, that the rights of the holder of a coupon, in respect to the guaranty, are substantially the same in this case, whether we hold the guaranty to be negotiable or not.
The contract of a guarantor is collateral and secondary. It differs in that respect, generally, from the contract of a surety, which is direct. And in general the guarantor contracts to pay if, by the exercise of due diligence, the debt cannot be made out of the principal debtor, while the surety undertakes directly for the payment, and so is responsible at once, if the principal debtor makes default. As was said by the Supreme Court of Pennsylvania, the *770 surety “is an insurer of the debt; the guarantor is the insurer of the solvency of the debtor.” Krampt’s ex’x v. Hatz’s ex’ors, 52 Penn. R. 525; Reigart v. White, Ib. 438; Hoffman v. Bechtel, Ib. 190.
But while this distinction exists, in general, between the contract of a surety and the contract of a guarantor, we must, in every case, look to the terms of the guaranty and to the circumstances under which it was made, to ascertain, by the rules of construction, the character and extent of the undertaking. If it thus appears to have been the intention of the guarantor to make himself liable on the default of the principal debtor, without the use of the ordinary means to compel payment by him, or proof of his insolvency, he will be held liable accordingly. His contract, in such a case, is a guaranty of payment, or of punctual payment, by the principal debtor, and not merely a guaranty of solvency, or of ultimate payment, after the usual means of enforcing it are employed.
In this ease the State, by the contract endorsed on the bonds, guaranties the “ punctual payment of the interest.” To fix the liability of the State, therefore, for the payment of any coupon, it is only necessary to show that the city of Wheeling, the principal debtor, has made default in its “punctual payment,” according to the contract. The contract provides for payment by Duncan, Sherman & Co. If they fail to pay any coupon upon demand, after it has become payable, the city has made default in “the punctual payment ” of interest, and the State is liable on its guaranty. It is not necessary that payment should be demanded likewise of the city itself.
The contract of a guarantor of a negotiable instrument differs from that of an endorser in respect to the degree of diligence incumbent on the holder. This difference is thus stated in Story on Prom. Notes, § 460: “In the ease of an endorsement, the endorser contracts to be liable to *771 pay the note, in case of its dishonor, if it is duly presented for payment to the maker at its maturity, and due notice is given to him of the dishonor, and not otherwise. In the case of a guaranty, the rule is not equally strict; and the guarantor contracts that, upon the dishonor of the note, he will pay the amount upon a presentment being made to the maker, and notice given him of the dishonor within a reasonable time; and this reasonable time is ordinarily measured by the fact, whether by the omission to make due presentment at the maturity of the note, and to give him due notice of the dishonor, he, the guarantor, has sustained any loss or injury. If he has, then he is exonerated pro tanto ; if he has not sustained any loss or injury, then he is liable for the whole note. So that punctual presentment for payment and punctual notice to the guarantor are not indispensable to charge him; whereas both are ordinarily indispensable to charge the endorser.”
The contract of the city of Wheeling, the performance of which is guarantied by the State, is contained in the bond to which the guaranty is attached, and to which it refers. It stipulates to pay the principal sum on the 1st day of July, 1872, at the banking-house of Duncan, Sherman & Co. of New York, and to pay interest thereon, at the same banking-house, on the 1st day of January and 1st day of July of each year, i£ on presenting to the said banking-house the proper coupon hereto affixed.” Thus, there arises a liability, under the bond, on the 1st day of January and 1st day of July of each year, to pay a sum equal to six months’ interest on the principal. Dor the sake of convenience, and to facilitate the collection and payment of the interest due on the bond, the coupons are furnished as evidence of their successive liabilities. They are the evidence of title to demand the interest; they may be separated from the bond and negotiated apart from it; and they serve the purpose of vouchers when the money *772 is paid upon them. But the contract for the payment of interest is in the bond, which ascertains and defines the terms of that contract. It is not material in what terms the coupon is expressed, so that it answers the purposes I have mentioned. Sometimes they contain words of promise, making them substantially promissory notes in themselves. Thus, in Thomson v. Lee County, 3 Wall. U. S. R. 327, the form is “ promise to pay to the bearer, at the Continental Bank in the city of New York, forty dollars’ interest on bond No.-.” Sometimes they are in the form of a mere ticket, or token, or “interest warrant,” as it is called. Thus, in Woods v. Lawrence County, 1 Black. U. S. R. 360, the coupon is in this form: “ County of Lawrence—Warrant No.-, for thirty dollars, being for six months’ interest on bond No.-, payable on the - day of - at the Office of the Pennsylvania Bailroad Company in the city of Philadelphia.” In each of these cases the coupon is furnished as evidence of a sum due on the bond for interest at a particular time and place, and as authority to the holder to receive it. In the former case the coupon contains an express promise to' pay to the holder the sum due for interest, and may be declared on as such. In the latter case it contains an acknowledgment of liability to pay the sum to the holder, from which the law will imply a promise to pay it. In either case the holder may maintain an action upon the coupon without the bond; but in both cases he receives a sum due and payable according to the terms of the bond. See McCoy v. County of Washington, 7 Am. L. Reg. 193; Maddox v. Graham & al., 2 Met. Ky. R. 56; Rose v. City of Bridgport, 17 Conn. R. 243.
Whether, 'therefore, the coupon is in the form of a promissory note, expressly promising to pay the sum due on the bond for interest, or in the form of a mere token or ticket, indicating the sum so due, it answers substan *773 tially the 'same purpose, which is to afford to the holder evidence of his right to demand what is due on the bond, and a convenient mode of collecting it. When the language is indefinite, it should be construed with reference to this object. The terms of the coupon in the present case are as follows: “Coupon, city of Wheeling, guarantied by the State of Virginia. Duncan, Sherman & Co. of New York will pay the bearer thirty dollars, the half-yearly interest 'on Wheeling bond, [stating the number of the bond,] due-18—,” [being the day on which the interest represented by the coupon is payable by the terms of the bond.] This language will admit of different constructions. It may be construed as a bill of exchange, or as a check drawn upon funds deposited with Duncan, Sherman & Co. as bankers, or as a mere token or ticket, indicating the sum due for interest on the bond at a certain time, and the place at which the holder may obtain it. If we construe the coupon as a bill of exchange, and as affording, in that form, a separate contract for the payment of the sum due for interest, the holder must deal with it according to its nature, and make due presentment and demand, and give due notice, in ease of dishonor, according to rhe law applicable to bills of exchange. The contract for interest as expressed in the coupon would, in that case, be different from the contract for interest expressed in the bond, and would give rise to different rights and liabilities, though due and payable at the same time. I think, however, that, for several reasons, these coupons should not be regarded as bills of exchange, though to put that construction upon them would not alter the result of this case. 1. They are not intended for acceptance. 2. They are not entitled to grace. 3. They are drawn on bankers, and against funds deposited with them, if they are drafts at all, and are, therefore, checks, rather than bills, in the strict and proper sense. In re Brown, 2 *774 Story’s R. 502. 4. To regard them as hills would make them import a contract varying from that in the bond, and impose a degree of diligence on the holder not in conformity with the general understanding and usage in respect to coupons. A coupon should not be construed so as to produce these results, unless its language manifestly requires such a construction. If we construe these coupons as mere tokens, or tickets, or interest warrants, indicating the times and places when certain sums will be due and payable for interest on the bond, we satisfy the language in which they are expressed, and make them consistent with the bond and with the purposes for which coupons are devised. And it is obvious, from the act of March 20, 1848, and the act of March 29, 1851, that the intention of the Legislature was, that the coupons should do nothing more than represent, in a negotiable form, the payments of interest to become due on the bond, and that, consequently, the interest should be due and payable on the coupons at the same times at which it would be due and payable by the terms of the bond.
The degree of diligence required of the holder of one of these coupons, is to be ascertained by reference to the relations of the parties liable for ils payment. It must be presented for payment within a reasonable time after it becomes due and payable, so as to save the liability of the State as guarantor in case of any injury resulting from delay. And so in case the city of Wheeling deposits funds with Duncan, Sherman & Co. to meet the coupons, as we may presume it will, a like degree of diligence is probably necessary to save the liability of the city in case delay should occasion injury, as by the failure of Duncan, Sherman & Co. But the indulgence thus allowed to the holder in making presentment and demand of payment, does not prevent the coupons from being regarded as due and payable on the day fixed for the payment of interest, *775 any more than in the case of a promissory note payable on a day certain; which, as against the maker, or as against a guarantor, where there is no endorser, need not be demanded on the day.
It is obvious, from the nature and purpose of these coupons, as I have endeavored to explain them, that they are not designed for indefinite circulation, or indeed for any circulation at all, after the time fixed for their payment. This is so upon any construction that can be placed upon the language of the coupons. The State has a right to claim that they shall be presented for payment within a reasonable time after they become payable, so that it may be relieved from its liability as guarantor, and the coupons, on their face, give notice of the guaranty. It cannot be supposed that the State would be willing to incur a responsibility wholly indefinite, in point of time, which would be the case if the coupons were designed to circulate, without any limit, after the day of payment. It is no answer to say that the city of Wheeling has provided by a mortgage for the indemnity of the State. The security may be lost, or its value impaired by delay; and the State, by accepting that security, did not abandon the character of guarantor and assume that of principal debtor. Watkins v. Crouch & Co., 5 Leigh 522; May v. Boisseau, 8 Leigh 164.
The coupons will, of course, still pass by delivery after the day of payment as before, just as a bill of exchange or a promissory note will. But, as in the case of a bill or note, the circulation thus allowed after the day of payment was not contemplated as a purpose for which the coupons were made and issued. The case of these coupons is not like that of a bank note. A bank note is issued for the purpose of indefinite circulation. The longer it circulates, the better for the bank.
It is argued, that these coupons must be regarded as payable on demand on or after the day specified, and not *776 as payable on that day; because the bond provides that the interest shall be paid by Duncan, Sherman & Co “ on presenting” to them the proper coupon. Sometimes the form of expression in. such bonds is, that the coupons shall be “ surrendered ” or “delivered.” But the meaning is the same, whether the coupon is to be “presented,” “surrendered” or “ delivered.” The coupon passes by delivery, and is evidence of the title of the holder to demand the interest. This evidence of title must be produced before the money it calls for can be demanded, and it must be surrendered when the money is paid. This is just what the law requires of every holder of a negotiable security, and no more. But can it be said that a bill of exchange or promissory note, payable on a specified day, or so many days after date, is not payable on a day certain, because payment cannot be obtained without a presentment and surrender of the bill or note ?
I conclude, therefore, that these coupons are negotiable instruments, payable at a day certain, namely, the day mentioned in each, as the day the interest called for by the coupon is payable, though the holder was not bound to present them for payment on that day, so as to save the liability of the city or of the State. And this view is sustained by numerous cases, which hold, that in an action upon a coupon, the payment of which has been refused, or for the payment of which no provision is shown to have been made, interest may be recovered from the time at which it became due and payable, according to its face. North Pa. R. R. Co. v. Adams, 54 Penn. R. 94; Hollingsworth v. City of Detroit, 3 McLean R. 472; Gelpcke v. City of Dubuque, 1 Wall. U. S. R. 175; Mills v. Town of Jefferson, 20 Wisc. R. 50.
The coupons in this case became due and payable at different times from the 1st day of January, 1862, to the 1st day of January, 1864, inclusive. The plaintiff became *777 the holder of them by a bona fide purchase from the Farmers’ Bank in November, 1864. It does not appear by what title the bank held them. They had all been stolen from the Second Auditor of the State under the Richmond government soon after they became payable. The plaintiff insists, that the coupons were not overdue at the time he received them, and that he is, therefore, entitled to enforce the payment of them, notwithstanding the theft. It is contended, on the other hand, that the coupons were overdue when the plaintiff received them, and that the fact of their having been previously stolen is fatal to his claim. The point of the objection as to the theft is simply, that the coupons had been stolen, not that they had been stolen from the State. The objection to the plaintiff's title on this ground would be the same, no matter from whom they were stolen.
What I have said already in explanation of the character and meaning of the coupons is sufficient, perhaps, to dispose of this question. But it will assist in clearing up some of the difficulties that have been raised in the case, and perhaps give a clearer view of its merits, to consider briefly what the rule of law is in respect to the transfer of overdue paper, and what is the precise foundation on which it rests.
No principle is better settled than that a party who takes a negotiable instrument by endorsement or delivery, after it has become due, gets no better title than the party had from whom he received it. This principle is laid down, and the authorities for it cited, in all the books on bills and notes. It is well stated and illustrated in Ashurst v.
Bank of Australia, 37 Eng. L. & Eq. R. 195, where the action was by an endorser against the maker of a negotiable promissory note, which had been endorsed to the plaintiff after maturity. The defendant pleaded, that before the transfer of the note to the plaintiff, the person *778 who ma(ie the transfer had become bankrupt, and the note vested in the defendant as his assignee; and the plea was held good. Lord Campbell said: “ If the note had been transferred by an uncertificated bankrupt before it was due, the bearer for value would have had a right to sue upon it; but the transfer being after it was due, he has no such right, because the transferee can take no better title than the transferer had. The bankruptcy goes to the very title of the transferer, and after it had become due, though called a negotiable instrument, it was in truth a chattel, and only transferable like any other chattel.” * * “ The plaintiff had no better title than if he had taken it from a person who had stolen it.” Coleridge, J. concurred. Erie, J. said: “It seems to me extremely important to draw the line clearly between negotiable instruments, properly so called, and ordinary chattels, which are transferable by delivery, though the transferer can only pass such title as he himself had. As to negotiable instruments during their currency, delivery to a bona fide holder for value gives a title even though the transferer should have acquired the instrument by theft; but after1 maturity, the instrument becomes in effect a chattel only, and is negotiable only in the sense I have mentioned.” Crompton, J. said: “I agree that the plaintiff is not entitled to recover upon this note, but I do not think it correct to say, that after maturity it becomes like a mere chattel, for the negotiability continues in all its strictness. In these cases two things are to be considered. Generally a chose in action is not assignable, but with regard to negotiable instruments, as bills and promissory notes, a different rule obtains, and they are negotiable by delivery; but the question of negotiability is different from the question of title. As to that, the party taking the instrument during the currency of it, may acquire a better title than the transferer had; but when it is over *779 due, it comes disgraced into the hands of the transferee, and that principle does not apply.” In Murray v. Lardner, 2 Wall. U. S. R. 110, a bona fide holder of coupon bonds acquired before their maturity was held entitled to recover, though the bonds had been stolen by a former holder. This is in conformity with numerous cases. And it follows, from the principles above stated, that a person who takes a negotiable instrument after it has become due cannot recover upon it if it has been previously stolen, unless it was stolen before maturity, and passed afterwards into the hands of a bona fide holder, from whom the plaintiff derived his title. If it was stolen after it became due, the title of every subsequent holder is necessarily liable to impeachment on that ground. See Chitty on Bills, 277; Ib. 296; 2 Parsons Notes and Bills, 279; Ib. 295; Davis v. Miller, 14 Gratt. 1.
At one time it was doubted whether the mere circum-' stance that a bill or noto was overdue at the time of its transfer was sufficient to affect the title of the endorser; and whether it was not necessary that there should be something on the face of the paper, besides the day of payment, to indicate that it had been actually dishonored, or some other evidence to charge the holder with knowledge of the circumstances affecting the validity of the paper, or the title of the person from whom he received it. This doubt was expressed by Lord Kenyon in Brown v. Davies, 3 T. R. 80, decided in 1789J But the other judges held, that the mere circumstance that the paper is overdue at the time of the transfer is sufficient, of itself, to affect the title of the holder. Ashurst, J. said: 16 Where the note is overdue, that alone is such a suspicious circumstance as makes it incumbent on the party receiving it to satisfy himself that it is a good one, otherwise much mischief might arise.” Buller, J. said: “There is this distinction between bills endorsed before and.after they become due: *780 If a note endorsed be not due at tbe time, it carries no suspicion whatever on the face of it, and the party receives it on its own intrinsic credit; but if it is overdue, though I do not say that by Jaw it is not negotiable, yet certainly it is out of the common course of dealing, and does give rise to suspicion. Still stronger ought that suspicion to be when it appears on the face of the note to have been noted for non-payment, which is the case here. But generally, where a note is due, the party receiving it takes it on the credit of the person who gives it to him.” Lord Kenyon, in Boehm v. Sterling, 7 T. R. 423, gave his assent to this rule, as he had previously done at Nisi Prius in the case of Good v. Coe, cited in the argument of Boehm v. Sterling; and it has never been questioned since. The history of this rule of law is thus accurately stated in the argument of counsel in Boehm v. Sterling: “This rule grew by degrees from the necessity of the thing, from principles of public policy and convenience, and to prevent frauds which it was scarcely possible to detect in each particular instance. In the case of Taylor v. Mather, it was said by Mr. Justice Buller, that if there were any circumstances of fraud in the transaction, and the instrument came into the plaintiff’s hands after it was due, he always left it to the jury, on the slightest circumstance, to presume that the endorser was acquainted with the fraud. But between that case and the case of Brown v. Davies, a period of near two years, it was found that so many cases had occurred at Nisi Prius, where, although there was much ground for suspicion, it was impossible to procure legal proof of the fraud, that the court considered it better, for the furtherance of justice, to adopt that as a rule of law which before was considered more as a rule of evidence, namely, that when a bill or note was taken after it was due, the party should stand in the situation of the person from whom he received it, and *781 be taken to have known all that the other knew concerning it.” This rule of law was not applied in Boehm v. Sterling, because the check to which it was sought to apply it had been issued by the drawers nine months after it bore date. It was held, that the drawers must have intended that the parties to whom they thus passed the check should be at liberty to pass it as they pleased, and that the date of the check should not throw any difficulty on the holder. Lord Kenyon said, that the defendants had the audacity to insist that payment could not be enforced because it had not been demanded nine months before they had themselves issued the paper. So it is held, that the doctrine applicable to overdue paper does not apply to common bank notes, because they are issued for the purpose of circulation for an indefinite time; nor, for the same reason, to post notes issued by a bank. Story Prom. Notes, § 500; Fulton Bank v. Phœnix Bank, 1 Hall R. 362; Key v. Knott & wife, 9 Gill & John R. 312.
When a negotiable instrument is payable at a time certain, it is overdue as soon as that time has passed. Parsons says that a paper payable at a time certain is dishonored by mere non-payment at that time. 1 Parsons on Notes and Bills, 270. So in 1 Am. Lead. Cas. 336, it is said, “if a note or bill is payable at a fixed time, it is of course overdue after the last day of grace is expired.” These coupons were, therefore, overdue when they came into the hands of the plaintiff, and the transfer to him was subject to the rules applicable to the transfer of overdue paper. It is no answer to say that a demand upon Duncan, Sherman & Co., and a refusal of payment by them, were necessary to make the maker and guarantor liable, or that, in consequence of the war, no such demand could be made, so that there was no ground for a presumption that the coupons had been actually dishonored when the plaintiff received them. These objections no more apply *782 in this case than they would in the case of a bill of exchange payable at a specified time, or so many days after date, and transferred after the day fixed for payment. As already shown, the question is not whether the coupons had been actually dishonored by demand and refusal. The rule in respect to the transfer of overdue paper is not a mere rule of evidence, to be overcome, in any particular case, by proof that the paper has not been actually dishonored. It is a rule of law, founded upon grounds of policy, and designed to prevent fraud, which declares that, in every case, the fact that the day of payment has passed before the transfer is, of itself, a ground of suspicion, and sufficient to affect the title of the transferree.
If we should regard these coupons as not being due and payable on the day specified, but only as duo and payable when demanded, on or after that day, the result will be the same. It is well settled in this country, by numerous decisions, that notes payable when demanded are not designed for indefinite circulation, and that they will become overdue by lapse of time. 1 Parsons Cont. 217, and cases cited; Merritt v. Todd, 23 N. Y. R. 28. If we regard the coupons as bills at sight or as checks, the same principle will apply. Down v. Halling, 4 Barn. & Cress. 330, (10 Eng. C. L. R. 347 ;) Serrell v. Derbyshire, &c., R. R. Co., 9 C. B. R. 811, (67 Eng. C. L. R.) There is no certain time at which such paper will be regarded as overdue. But the time which had elapsed between the several periods at which payment of these coupons was demandable, and the time at which they came to the hands of the plaintiff, was amply sufficient to stamp them all as overdue. And it is not admissible, in respect to such instruments, any more than in respect to those payable at a day certain, to exempt them from the rule applicable to overdue paper, by proof that, in point of fact, they have not been dishonored. To allow such proof, would be to deny alto *783 gether the application of the rule. In order to exempt these coupons from the operation of the rule as to overdue paper, they must be likened to common bank notes, and held to be designed, in the same manner, for indefinite circulation, as well after as before the time at which payment of them was demandable.
I have seen no case involving the precise question, whether a coupon is to be considered as overdue after the day on which payment might have been demanded, except the case of The Bank of Louisiana v. The City of New Orleans, 5 Am. L. Reg., N. S., 555, in the provisional court of Louisiana. In that case coupons were held to be overdue after the days of payment named in them, and subject to the rule in respect to overdue paper. I do not cite that case, however, as authority.
These views are conclusive of the case, and it is not necessary to consider other questions that have been raised in the argument. This opinion, too, has already been too much prolonged in consequence of the novelty of the questions involved.
I am, therefore, of opinion, that there is no error in the judgment of the Circuit Court, and that the plaintiff take nothing by his bill. The order which follows this judgment, requiring the coupons to bo delivered to the Second Auditor for the use of the Commonwealth, is properly no part of the judgment, though apparently incorporated with it. But as the plaintiff is not the lawful owner of the coupons, it is not material to him whether they are delivered to the State or not, and he cannot, therefore, complain of this order. Such an order might have been properly made on motion by the State, after judgment, upon condition of leaving copies. The coupons had been acquired by officers of the Richmond government during the war, which, whether a lawful government or not, was an actual one, and claimed to represent the State and people of Yir *784 ginia. Property acquired by that government -with the means and resources of the people of Virginia, and held by them as the property of the State, may properly be claimed as such by the present government.
It is proper to add, that in what I have said as to the liability of the State upon the guaranty, I have had no reference to the question raised in the answer of the Auditor as between this State and the State of West Virginia. What body of people is bound to respond to the obligation imposed by that guaranty, is a question not before us, and upon which I express no opinion.
I am of opinion that the judgment should be affirmed.
Moncure, P. concurred in the opinion of Joynes, J.
Judgment aeeirmed.