KNOWLTON S. CHAFFEE. *vs.* MIDDLESEX RAILROAD COMPANY.

MANUFACTURERS' FIRE AND MARINE INSURANCE COMPANY *vs.* SAME & another.

Suffolk.    November 18, 1887. — March 2, 1888.

Present : MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Bonds — Coupons — Days of Grace — Election — Shares of Stock — Damages — Specific Performance.*

Bonds for the payment of money and interest coupons thereon are not entitled to grace.

If bonds issued by a corporation provide for payment at maturity, in money or in shares of stock at the option of the holder, the former to be raised from a sale of the latter, time is of the essence of the contract, and a bondholder who on Monday, the day of maturity being Sunday, offers his bonds for conversion into shares, is too late.

A corporation issued bonds payable by statute in money or in shares of stock at or before maturity at the election of the holder, and, the bonds maturing on Sunday, at three o'clock on the Saturday afternoon before, that being the close of its business hours, sold and transferred to a trust company all the shares uncalled for and legally issuable for money to redeem the outstanding bonds. A bondholder was told, when he applied at the treasurer's office at about ten minutes after three o'clock to convert his bonds into shares, that he was too late, and did not in consequence present his bonds for conversion on that afternoon. On Monday he surrendered his bonds for their par value in money, not waiving thereby any rights to the shares or to their value. Subsequently the bondholder brought a bill in equity against the corporation for relief, and, upon its being merged in another corporation, joined the latter as a party defendant. *Held*, that he had seasonably exercised his right of election, and that he was entitled, not to specific performance, but only to the market value of the shares at the maturity of the bonds.

An insurance company which makes an investment in unauthorized bonds may enforce the payment of the bonds.

Two BILLS IN EQUITY, alleging that the plaintiffs were the holders of bonds issued by the Middlesex Railroad Company,

and dated February 1, 1875, each of which provided for the payment of the principal sum due thereon at the treasurer's office on February 1, 1885, " with interest at the rate of eight per centum per annum payable semiannually on the first day of August and February in each year, upon surrender of the interest warrants hereto attached as they become due," with a covenant for the issue " to said bearer or his order five shares in the capital stock of said company," upon " the surrender of this obligation to the treasurer of the company by the bearer, at the date of maturity of any interest warrant "; that twenty interest warrants were attached to each bond, each of which was, save the proper date and number, in form similar to the following: " $20. Interest warrant $20. The Middlesex Railroad Company will pay the bearer at the office of the treasurer in Boston twenty dollars on the first day of ——, being six months' interest on certificate of indebtedness No. — "; that the St. of 1880, c. 103, §§ 3, 4,* authorized the issue of new shares of stock, and legalized the issue of these bonds, providing for their redemption by or conversion into thirty-five hundred shares of the new stock; that the plaintiffs as such holders, on February 2, 1885, — February 1 being Sunday, — surrendered their bonds to the Middlesex Railroad Company, and demanded five shares of its capital stock for each bond, but it refused to issue such shares, and tendered in payment money to the amount of the par value of the bonds; and prayed that the Middlesex Railroad Company might be compelled to procure, issue, and transfer to the plaintiffs shares of its capital stock to the amount to which they were severally entitled.

---

* The sections are as follows :

" Section 3. The Middlesex Railroad Company is hereby authorized to increase its capital stock to an amount not exceeding one million of dollars.

" Section 4. Three hundred and fifty thousand dollars of said stock shall be applied to the payment or redemption of the bonds of said company already issued under the following dates, to wit : — the first day of February, eighteen hundred and seventy-five, and the first day of July, eighteen hundred and seventy-seven, at or before maturity; and the issue of said bonds is hereby legalized and made valid, and the holders thereof may convert them into stock as said bonds mature, unless redeemed by the company before maturity."

IN THE FIRST CASE, the bill was filed on February 26, 1885, and also alleged that the plaintiff was the holder of thirty bonds payable to " Knowlton S. Chaffee, or bearer." Hearing before *Holmes*, J., who found, among other things not material, that the plaintiff was informed when he surrendered his bonds, on February 2, 1885, that he was too late, as he should have made his offer and demand on Saturday, January 31, 1885; that the shares had all been sold for money with which to redeem the bonds; and that the plaintiff finally surrendered the bonds without waiving his rights to the stock or its value, if it had any; and reported the case for the consideration of this court.

IN THE SECOND CASE, the bill was filed on March 19, 1885, and also alleged that the plaintiff was the holder of fifty bonds, each of which was payable "to —— or bearer"; and that on Saturday, January 31, 1885, the plaintiff gave notice of its desire to surrender its bonds for shares of stock, but was informed that it was too late, and that the shares would not then be issued. On January 7, 1887, the plaintiff moved to amend its bill by making the Boston Consolidated Street Railway Company, into which the Middlesex Railroad Company had been merged, a party defendant, and by adding a prayer that it might be compelled to transfer and deliver to the plaintiff shares of its capital stock equivalent to the number for which the first named defendant had been liable. At the hearing, before *C. Allen*, J., the following facts appeared:

The Middlesex Railroad Company had made an agreement with the International Trust Company, that all the new stock that had not been delivered for the bonds at the close of business hours on January 31, 1885, should be delivered to the trust company at an agreed price, to be used to redeem the bonds then delivered or outstanding. At three o'clock in the afternoon of Saturday, January 31, 1885, that being the close of business hours, the finance committee of the directors of the Middlesex Railroad Company sold for cash and transferred to the trust company six hundred and fifty-five shares, being the balance of the fifteen hundred shares appropriated by the St. of 1880, c. 103, for the bonds which had not been converted or required by the signified option of any bondholder, and, the price for these shares being then paid in cash, the shares were transferred.

Afterwards, and before twenty minutes past three o'clock on the same afternoon, Samuel Appleton, the president of the plaintiff corporation, went to the office of the Middlesex Railroad Company, and told a clerk in the presence of the finance committee, composed of the president and two directors, that he had come to convert the fifty bonds held by the plaintiff. The clerk asked him if he had the bonds with him, and Appleton answered that he had not, that they were in the Union Safe Deposit Vaults, and that the usual hour for closing the vaults had passed, upon which the clerk informed him that it would be necessary to have the bonds. Appleton then asked to see the president of the Middlesex Railroad Company, and, as he stepped forward, said to him that he wanted to convert the bonds held by the plaintiff. Powers, the president, then told him that at three o'clock all stock which had not been taken up by the conversion of bonds had been sold and transferred to a third party; that it was too late to convert the bonds into stock, but that they would pay the bonds in cash. Appleton then left, and returned to the office of the Middlesex Railroad Company at five minutes after four o'clock, and, finding the door closed, dropped through a slit in the door the following letter:

"January 31, 1885. To the President of the Middlesex Railroad Co., Boston. Dear Sir, — Having called at your office this day at 3.20 P. M. and demanded a conversion of ($25,000) Twenty-five Thousand Dollars, face value, of bonds of your Company due and convertible on February 1st, 1885, I hereby repeat said demand for conversion to said stock, to amount of 250 shares, as in bonds provided. Yours respectfully, Samuel Appleton, Pres."

The bonds were in the Union Safe Deposit Vaults, the usual hour for closing which was three o'clock; but, on application to the sub-manager, the vaults could have been opened by him and a clerk. In January, 1885, the sub-manager lived on Beacon Street, the clerk lived at the Norfolk House, and the president of the Middlesex Railroad Company also lived on Beacon Street.

The judge found, that at about ten minutes after three o'clock in the afternoon of January 31, 1885, Appleton was informed by the president of the Middlesex Railroad Company that it was

then too late to present his bonds; that Appleton could and would have got his bonds and presented them on that afternoon, but for Powers's telling him that it was too late; and that under these circumstances the presentation of the bonds on that afternoon, at a little later time than ten minutes after three o'clock, was waived by the Middlesex Railroad Company.

On Monday, February 2, 1885, Appleton went to the office of the Middlesex Railroad Company with the bonds, and again demanded the shares to which the plaintiff was entitled on converting the bonds into stock, and surrendered the bonds with one coupon attached, receiving in exchange a check for $26,000, upon the agreement set forth in the following letter :

"Boston, 2 February, 1885. Samuel Appleton, Esq., President Manufacturers' F. & M. Ins. Co. Dear Sir, — I hand you herewith check for $26,000, being the amount of the fifty $500 bonds with coupon attached of the Middlesex R. R. Co., surrendered by your Company to the Middlesex R. R. Co. this morning, and I expressly reserve on behalf of the Middlesex R. R. Co. all the rights of the Manufacturers' M. & F. Ins. Co. to the stock of the Middlesex R. R. Co. which you have demanded in exchange for the bonds, and which I have refused to deliver, or for the value of such stock over and above the par value of the bonds surrendered; it being expressly agreed that the acceptance of the above sum of $26,000 by your company is not a waiver of its rights to the stock or its value, if it has any. Yours, Middlesex Railroad Co., by Chas. E. Powers, Prest."

The stock of the Middlesex Railroad Company had sold on the market in small lots, between December 1, 1884, and January 31, 1885, for prices ranging from 108¾ to 112.

On August 19, 1886, the Middlesex Railroad Company voted to increase its capital stock, the rights to subscribe to the new stock being valuable rights, which were sold on the market, and declared dividends of one and three quarters per cent each in April, July, and October, 1885, and of one and one half per cent each in January, April, and July, 1886. On August 21, 1886, by articles of consolidation duly executed and approved, the Middlesex Railroad Company and the Highland Street Railway Company were consolidated, and became a new corporation, called the Boston Consolidated Street Railway Company, each

shareholder in the Middlesex Railroad Company being entitled to seven eighths of a share of stock in the new corporation for each share held by him. The Boston Consolidated Street Railway Company, on January 1, 1887, paid a dividend of four per cent. In January, 1885, there was no mortgage or pledge of the franchises of the Middlesex Railroad Company, and all bills for the construction thereof were paid; but at that time it owed money borrowed to pay, among other things, for an extension of its road, which branch had at that time been completed and paid for with the money borrowed.

The plaintiff contended that it was originally entitled, as against the Middlesex Railroad Company, upon surrendering the $25,000 and interest thereon, to have a decree for a certificate for 250 shares of stock, and to subscribe at par for $15\frac{62}{100}$ more shares, and for the payment of such sum as would amount to the dividends which had been declared on the 250 shares; that it was entitled to a decree against the Boston Consolidated Street Railway Company, upon surrender of the money, for a certificate for $232\frac{4}{10}$ shares; or that, if it was impossible for the defendants to comply with such decrees in whole or in part, it was entitled, by way of compensation, to the market value of the shares or rights to subscribe upon the date at which the market value of the shares of either corporation, or of the rights, had been highest between January 31, 1885, and the date of the decree.

The judge reported for the consideration of the full court the questions whether the plaintiff is entitled to the relief sought; whether the law as to investment of the funds of insurance companies prevented the plaintiff from obtaining this decree; and whether, if the plaintiff was entitled to compensation only, it should be based upon the value of the stocks and the rights to subscribe at the date of the decree, or, if at any other day, at what day. The case was to be sent to an assessor to determine the values mentioned, and such decree was to be entered as equity might require.

*Samuel Hoar,* for the plaintiff in the first case.

I. Bonds and coupons, payable to bearer, have all the qualities of commercial paper. These coupons, when severed from the bonds, are negotiable, and pass by delivery. They then cease to be incidents of the bonds, and become in fact inde-

pendent claims. They possess the essential attributes of commercial paper. They are suable without the production of the bond. They are promissory notes, and are properly declared on as such, and, when overdue, will bear interest. *Spooner* v. *Holmes*, 102 Mass. 503, 507. *Haven* v. *Grand Junction Railroad*, 109 Mass. 88. *Hinckley* v. *Union Pacific Railroad*, 129 Mass. 52. *Thomson* v. *Lee County*, 3 Wall. 327, 332. *Aurora City* v. *West*, 7 Wall. 82, 105. *Clark* v. *Iowa City*, 20 Wall. 583. *Cromwell* v. *County of Sac*, 94 U. S. 351, 362. *Hodges* v. *Shuler*, 22 N. Y. 114. *Evertson* v. *National Bank of Newport*, 66 N. Y. 14. Pierce on Railroads, 107. 2 Ames on Bills and Notes, 774, note 5. Jones on Railroad Securities, §§ 320–326.

II. Negotiable interest coupons are entitled to days of grace, like other negotiable instruments payable at a given day, or on time; and therefore one purchasing them after the expiration of the time of payment specified, but before the expiration of the days of grace, is a purchaser before maturity; so a negotiable bond, payable at a given day, or on time, is entitled to days of grace. *Hodges* v. *Shuler*, 22 N. Y. 114. *Evertson* v. *National Bank of Newport*, 66 N. Y. 22.

III. Even if days of grace were not allowed on these bonds and coupons, the offer to surrender having been made by the plaintiff on the next business day after they became payable, he could be held guilty of nothing more than a mistake easily and honestly made; and it is submitted, that time is not so far essential to the contract that an absolute punctuality of performance is indispensable. *Todd* v. *Taft*, 7 Allen, 371.

*W. C. Loring*, for the plaintiff in the second case.

I. The plaintiff exercised its option of converting its bonds into stock within the time allowed it. The notice on Saturday coupled with the defendant's waiver was sufficient. The plaintiff had the whole of Saturday in which to exercise its option. Shaw, C. J., in *Gordon* v. *Parmelee*, 15 Gray, 413, 418. *Estes* v. *Tower*, 102 Mass. 65. *Dibble* v. *Bowater*, 2 E. & B. 564. *Hinton* v. *Duff*, 11 C. B. (N. S.) 724.

The rule as to business hours is the rule of the law merchant, and consists of two parts. 1. To charge an indorser of a negotiable paper, demand must be made on the maker, if not a banker, within reasonable hours, and, if he is a banker,

within banking hours on the date when the paper becomes due. *Wilkins* v. *Jadis*, 2 B. & Ad. 188. *Farnsworth* v. *Allen*, 4 Gray, 453. But a demand after banking hours is good, if the banker is in fact found. *Garnett* v. *Woodcock*, 6 M. & S. 44. *Shepherd* v. *Chamberlain*, 8 Gray, 225. 2. The contract of the acceptor of a draft, or of the maker of a note, bearing days of grace, is to pay on demand on the third day of grace. Buller, J., in *Leftley* v. *Mills*, 4 T. R. 170, 174. Shaw, C. J., in *Gordon* v. *Parmelee*, 15 Gray, 413, 418.

II. Upon exercising its option within the time, the plaintiff became entitled as against the Middlesex Railroad to a decree for a certificate upon two grounds.

1. Upon converting its bonds into stock the plaintiff became a stockholder, and having become a stockholder he was entitled to a decree for the issue of a certificate: upon exercising its option to convert its bonds into stock the plaintiff became a stockholder; and the plaintiff became a stockholder by force of St. 1880, c. 103. Before the statute, the plaintiff could not have become a stockholder without the co-operation of the company; before the statute, the plaintiff had nothing more than a covenant that upon its exercising its option the company would issue stock to it. (The covenant was then invalid, but that is not material in this connection.) But that contract right was changed by the statute into a property right. The statute provided that the holders of the bonds " may convert them into stock as said bonds mature." Upon exercising its option, the plaintiff became a stockholder by force of the statute without the co-operation of the company.

The attempt to issue shares to others before the expiration of the time within which the plaintiff had the right to make its bonds stock, could not defeat this right of the plaintiff. An attempt to create shares without legislative authority is confessedly a nullity. In the case at bar there was no power given by the Legislature to increase the capital stock except by the conversion of bonds into stock, until the time had expired within which the stockholders had the right to convert their bonds into stock. Until that time had expired the only way of increasing the capital stock authorized by the Legislature was by the creation of new shares brought into being by bonds being converted into

shares. So far as an attempt to create new shares in any other way was concerned, there was no more legislative authority than there would have been had there been an entire absence of legislative authority to increase the capital stock by issuing new shares, in which case an attempt to issue shares is confessedly a nullity. If the plaintiff became a stockholder, it was entitled to a decree for a certificate. Lowell, Transfer of Stock, §§ 240, 241. Parker, C. J., in *Chester Glass Co.* v. *Dewey*, 16 Mass. 94, 101. *Sewall* v. *Boston Water Power Co.* 4 Allen, 277. *Pratt* v. *Taunton Copper Co.* 123 Mass. 110. *Iasigi* v. *Chicago, Burlington, & Quincy Railroad*, 129 Mass. 46. *Child* v. *New York & New England Railroad*, 129 Mass. 170. Morton, C. J., in *Boston & Albany Railroad* v. *Richardson*, 135 Mass. 473, 474. *Rosenkrans* v. *Lafayette Railroad*, 18 Fed. Rep. 513.

2. If the plaintiff did not in fact become a stockholder, it became entitled to stock which could not be issued to any one else, and equity will therefore specifically compel the issue of the shares to the plaintiff. The St. of 1880, c. 103, did not give the Middlesex Railroad Company an absolute right to increase its capital stock at any time and in any way. The St. of 1880, c. 103, § 4, authorized an increase of the capital stock by the issuing of 3,500 shares, which "shall be applied to the payment or redemption of the bonds of said company already issued," — of which the plaintiff's bonds were confessedly a part.

The St. of 1880, c. 103, § 4, when it became a law, did not authorize an immediate issue of the 3,500 shares. The right to issue those shares did not arise until the holders of the bonds, to the payment or redemption of which these shares were to be "applied," presented their bonds for payment or redemption. Until the holders presented the bonds for payment or redemption, the railroad company had no right to issue a share of that stock. When the holders did present the bonds, the right to issue the 3,500 shares came into existence for the first time. If the holders on presenting the bonds had demanded payment for them, the right of issuing stock, which then had come into existence, would have been the right to issue the stock to third persons for cash. On the other hand, if the holders demanded that the bonds should be redeemed, the right of issuing stock thereby created would have been the right to issue the stock to

the bondholders ; that is, in that event the right of increasing the capital stock given by the St. of 1880, c. 103, would have been a right to increase it by issuing new shares to the holders of the bonds, and in no other way.

In the case at bar, in the event that has happened, the right of the Middlesex Railroad Company to issue the new stock appropriated to the plaintiff's bonds is precisely the same as it would have been had the St. of 1880, c. 103, gone no further than to authorize an increase of the capital stock by issuing new shares to the holders of the bonds, who elected to convert them into stock. The new stock cannot be issued to any one but the plaintiff, and the statute says it " shall be " issued to the plaintiff.

The attempt to issue these shares to a third person before any right to issue them in any way had come into existence was a nullity, and does not stand in the way of the plaintiff's right to a decree that these be issued to it.

*L. M. Child,* for the defendants.

FIELD, J. Before the St. of 1824, c. 130, a negotiable promissory note payable in this Commonwealth was not entitled to grace unless it was made expressly payable with grace. The St. of 3 & 4 Anne, c. 9, was never enacted here. *Jones* v. *Fales,* 4 Mass. 245. *Barker* v. *Parker,* 6 Pick. 80.

By the St. of 1824, c. 130, grace was allowed, in like manner as on foreign bills of exchange, on all bills of exchange payable at sight or at a future day certain within this State, and on all promissory negotiable notes, orders, and drafts payable at a future day certain within this State, " in which there is not an express stipulation to the contrary." Rev. Sts. c. 33, §§ 5, 6. Gen. Sts. c. 53, §§ 15, 16. Pub. Sts. c. 77, §§ 9, 10. It is only by virtue of this statute and its re-enactments that grace is allowed in this Commonwealth on promissory notes.

By the St. of 1852, c. 76, bonds or other obligations under seal for the payment of money issued by a corporation, or joint stock company, payable to bearer, or to some person designated or bearer, or payable to order, " are hereby made negotiable in the same manner and to the same extent as promissory notes are now negotiable." Gen. Sts. c. 53, § 6. Pub. Sts. c. 77, § 4. The bonds in these cases, even if it be conceded that they are bonds for the payment of money within the meaning of the

statute are not entitled to grace. They are not in fact negotiable promissory notes within the meaning of the Pub. Sts. c. 77, § 9. Bonds for the payment of money at common law were not entitled to grace, and they cannot be held to have been included among the instruments described in the Pub. Sts. c. 77, § 9.

Whether these bonds are negotiable or not under the Pub. Sts. c. 77, § 4, is immaterial in these cases. If, by reason of the stipulation that they may be converted into stock at the election of the holder, they are excluded from the provisions of the Pub. Sts. c. 77, § 4, yet an assignee can maintain a suit in equity upon them in his own name. In the first suit, the bonds are payable " to Knowlton S. Chaffee, or bearer," and Chaffee is the plaintiff in the suit; in the second suit the bonds are payable " to ———, or bearer," and it is found that the plaintiff became the holder and owner of them " on or prior to January 31, 1885." See *Chapin* v. *Vermont & Massachusetts Railroad*, 8 Gray, 575.

The Middlesex Railroad Company originally issued these bonds without authority of law, but the issue was subsequently ratified by the St. of 1880, c. 103, § 4. There were two series of bonds thus issued, and these bonds are a part of the first series. By this statute the holders of these bonds " may convert them into stock as said bonds mature, unless redeemed by the company before maturity." Each bond covenants that upon the " surrender of this obligation to the treasurer of the company by the bearer, at the date of maturity of any interest warrant, they will cause to be issued to said bearer or his order five shares in the capital stock of said company." The bonds were dated on February 1, 1875, and were payable on February 1, 1885, " with interest at the rate of eight per centum per annum, payable semi-annually on the first day of August and February in each year, upon surrender of the interest warrants hereto attached as they become due." As the first day of February, 1885, was Sunday, the bonds matured on January 31, 1885. Pub. Sts. c. 77, § 8.

It is contended that the interest warrants were entitled to grace, and that by the terms of the bonds, although not by the terms of the statute, the holders of the bonds could convert them into stock on the day when the last interest warrant became due, and that therefore the offer to surrender the bonds and the demand for the stock were made in time. It is not a reasonable

inference that the company issuing the bonds intended that the last interest warrants, which purport to be payable on the same day as the bonds, should be entitled to grace when the bonds were not, and it is only as holders of the bonds that the plaintiffs are entitled to stock. Interest warrants, or coupons, in form like these, when detached from the bonds, have been considered as having many of the qualities of negotiable promissory notes; but we are of opinion that they are not negotiable promissory notes within the meaning of the Pub. Sts. c. 77, § 9. When interest is payable on a note or bond at fixed times, no grace is allowed. The device of separate detachable interest warrants, payable to bearer, has been adopted for convenience, and courts have invested them when detached with many of the qualities of negotiable promissory notes, to carry into effect the intention of the parties apparent on the face of the contract; but they purport to be only promises to pay certain sums of money as interest on the principal obligation. They are not in common speech called promissory notes, nor have they the same history, or in all respects the same characteristics, as promissory notes, and they could not have been within the contemplation of the Legislature in passing the St. of 1824, c. 130. Although we are confined to a consideration of the construction to be given our statutes, we do not wish to imply that, either by usage or the general law merchant, days of grace should be allowed either on the bonds or the coupons. We are not satisfied with the decision in *Evertson* v. *National Bank of Newport*, 66 N. Y. 14. See *Arents* v. *Commonwealth*, 18 Gratt. 750, 773; 2 Dan. Neg. Inst. (3d ed.), §§ 1505, 1506, and notes.

The reasons why days of grace were originally allowed on foreign bills of exchange payable at sight, or at a future day certain, have little application to bonds with coupons issued by a corporation to obtain money, which usually have a long time to run, and are commonly bought and held as an investment. Such bonds and coupons do not serve the purposes of commercial paper.

By the St. of 1880, c. 103, §§ 3, 4, the Middlesex Railroad Company was authorized to increase its capital stock to an amount not exceeding one million of dollars, and three hundred and fifty thousand dollars of this stock was to be applied to the payment or redemption of the two series of bonds at or before

their maturity. Before this statute, it does not appear that the corporation had any stock which it could lawfully issue in payment or redemption of these bonds. It was important that the corporation should know on or before the maturity of the bonds whether the holders elected to take stock or money, because the stock which was not taken must be applied to the payment in money of the bonds, and this could only be done by selling the stock for money; and the money must be paid on demand, at the maturity of the bonds. Time was essential, and unless the holder of the bonds on or before their maturity presented his bonds and demanded stock, or at least offered to do this, he lost all right to receive stock on the maturity of the bonds. The defendant had the right to assume that all holders of bonds who desired stock would make the surrender on or before the maturity of the bonds, and to sell for money all stock not called for on or before that day. That the defendant actually sold all the stock which it could apply to the redemption of these bonds at three o'clock of the afternoon of January 31, 1885, without waiting until that day expired, is immaterial in the first suit; because, if it be conceded that the plaintiff had the whole of that day to present his bonds and demand the stock, he neglected to do this, and when he presented the bonds on February 2, 1885, it was too late.

The bill brought by Chaffee                    *Must be dismissed.*

In the suit brought by the Manufacturers' Fire and Marine Insurance Company there was evidence that, on the afternoon of January 31, 1885, between three o'clock and twenty minutes past three, Appleton, the president of the plaintiff corporation, went to the office of the defendant, and met there the clerk and president of the corporation with two of the directors, who with the president constituted the finance committee of the company and Appleton told them that he wished to convert the fifty bonds held by the plaintiff corporation into stock. The clerk asked him if he had the bonds, and Appleton answered that he had not, that they were in the Union Safe Deposit Vaults, and that the usual hour for closing the vaults had passed. The clerk then informed him that it would be necessary to have the bonds. Appleton then asked to see the president of the railroad company, and when he came forward Appleton said to him that

he wanted to convert the bonds into stock. Powers, the president, "then told him that at three o'clock all stock which had not been taken up by the conversion of bonds had been sold and transferred to a third party, that it was too late to convert the bonds into stock, but that they would pay the bonds in cash." Appleton then left, and returned at five minutes before four o'clock, and, finding the door of the office closed, dropped a letter through a slit in the door, in which he demanded that the bonds should be converted into stock. It is also found as a fact, that " Appleton could and would have got his bonds and presented them on that afternoon but for Powers's telling him that it was too late, and that under these circumstances the presentation of the bonds on that afternoon at a little later time than ten minutes after three o'clock was waived by the Middlesex Railroad Company." On February 2, 1885, the bonds were presented at the office, and the stock demanded, and by agreement of the parties the bonds were received by the company, and a check for $26,000, being the par value of the bonds with the last interest warrants, was given to the plaintiff. This check was received by the plaintiff without waiving " its rights to the stock or its value, if it has.any," above the par value of the bonds surrendered. The check was paid, and the plaintiff received the money, and in its bill offers to return it. The stock at that time was worth more than par. It is found as a fact, that at three o'clock on the afternoon of January 31, 1885, the Middlesex Railroad Company undertook to sell and transfer to the International Trust Company " six hundred and fifty-five shares [of stock] being the balance of the fifteen hundred shares appropriated by the St. of 1880, c. 103, for the bonds which had not been converted or required by the signified option of any bondholder mentioned above; that the price for these shares was then paid in cash, and the shares transferred." It appeared that the whole amount of the series of bonds issued by the company in the form and of the date of those owned by the plaintiff was one hundred and fifty thousand dollars, so that all the stock which the Middlesex Company could lawfully issue and deliver in exchange for the bonds of the plaintiff was in fact issued and transferred for cash to the International Trust Company at three o'clock in the afternoon of January 31, 1885.

We know of no rule of law which required the plaintiff to present the bonds for redemption at the office of the treasurer before three o'clock of the afternoon of January 31, because that happened to be the time when the business office was usually closed for the day. We think that the bonds could have been presented there at any reasonable time on that day, and that on the facts found the Middlesex Railroad Company had seasonable notice on the day of the maturity of the bonds that the plaintiff elected, and was ready and willing, to convert them into stock.

The election to take stock in payment of a bond, however, does not make the bondholder a stockholder. His right to become a stockholder depends upon the performance of an executory contract by the corporation, and the bondholder is not a stockholder until the contract is performed. Whether a court of equity will specifically enforce the performance of the contract depends upon a variety of considerations. Executory contracts for the sale of stock which is commonly bought and sold in the market are not specifically enforced as a matter of course. Unless there are some equitable circumstances, the remedy at law is adequate. See Pom. Eq. Jur. § 1402 and notes. If it be true that bonds of corporations like these, which may be converted into stock at the election of the holder, are usually specifically enforced against a corporation, even although the stock is commonly bought and sold in the market, on the ground that this is a right against the corporation derived from statute, and that good policy requires that corporations should specifically perform their statutory obligations, yet a court of equity could not compel a corporation to issue stock for this purpose which it was not legally authorized to issue.

The cases where corporations have issued certificates of stock to assignees on forged transfers have no application. A certificate is evidence of the ownership of stock, and a forged transfer does not convey the stockholder's interest, and he remains a stockholder, and is entitled to his certificate and to all dividends in the same manner as if no new certificates had been issued to an assignee under a forged assignment. The difficulty courts find in dealing with *bona fide* holders of certificates issued on forged assignments is occasioned by the fact that the recognition of such certificates as valid would often create an over-issue of

stock. The questionable practice which has sometimes been adopted of compelling the corporation to buy stock in the market, if the stock is commonly bought and sold in the market, and then of compelling a conveyance of it to the plaintiff, is in effect nothing more than compelling the corporation to pay as damages the market price of the stock at the time when the conveyance is ordered to be made. And if to this the intervening dividends are added, it is in effect assessing damages up to and as of the date of the decree, which is of the nature of specific performance.

It sufficiently appears by the report, that the stock of the Middlesex Railroad Company was bought and sold in the market at the time the bonds matured. We think that it also appears by the report, that the Middlesex Railroad Company had disabled itself before the bill was filed from issuing stock in payment or redemption of these bonds, and that the plaintiff knew this. This alone is sufficient to defeat specific performance, unless the International Trust Company could be compelled to surrender some of the stock transferred to it, and the Trust Company has not been made a party to the suit. When a contract is broken before the suit is brought, and the plaintiff knows this, and specific performance is impossible, damages are usually assessed as of the date of the breach, with interest from that time. There is another fact in the case which furnishes an additional reason why damages should not be assessed as of the date of the decree. The plaintiff received before the bill was filed the par value of the bonds in money, and has had the use of this money until the present time, which is more than three years. It also inferentially appears that since the filing of the bill, which was on March 19, 1885, all the stock of the Middlesex Railroad Company has been surrendered, under articles of consolidation entered into with the Highland Street Railway Company pursuant to the St. of 1886, c. 229, whereby a new corporation has been formed, called the Boston Consolidated Street Railway Company, which has been made a party to the suit.

It does not appear that the Boston Consolidated Railway Company has any stock which it can lawfully issue to the plaintiff in satisfaction of its claim. The conduct of the plaintiff in accepting $26,000, although with a reservation of its rights, is

inconsistent with an absolute election on its part to take stock instead of money.    The plaintiff entered into no contract to repay this money, although it offers to repay it in its bill.    It could have invested the money if it saw fit in stock of the Middlesex Railroad Company, unless the statutes prohibited such an investment.    It was to the extent of $25,000 in effect a payment on account, and although it is not inconsistent with a claim for the value of the stock if it exceeded $25,000, it is in a sense inconsistent with a specific allotment of stock to the plaintiff.    If the plaintiff intended to elect once for all to take stock rather than money, it should at once have brought its bill against the Middlesex Railroad Company and the International Trust Company, and attempted to compel a transfer to itself of some of the stock which by statute had been appropriated to the redemption of its bonds.    Having neglected to do this, and having received money on account, which it has retained, equity does not require that it should be paid more than the market value of the stock at the time it demanded it.    To permit the plaintiff to receive all the advantages which have subsequently happened to accrue from the ownership of stock, while at the same time it has had the use of the money, would be to permit it to speculate upon the advantages of taking either money or stock according to the event.

The defendants cannot resist payment on the ground that the plaintiff was not authorized to invest its money in the stock of the Middlesex Railroad Company, if this be true, upon which we express no opinion.    Pub. Sts. c. 119, § 55.    *National Bank* v. *Whitney,* 103 U. S. 99.

By the terms of the report, an assessor is to be appointed to determine the value of 250 shares of the stock of the Middlesex Railroad Company on January 31, 1885, and the plaintiff is entitled to a decree for the amount of this value over $25,000, with interest from that day.                                                   *So ordered.*